[No. G012846. Fourth Dist., Div. Three. May 10, 1994.]

JEFFREY HARRIS, Plaintiff and Appellant, v.
CITY OF COSTA MESA, Defendant and Appellant.

COUNSEL

David A. Delman for Plaintiff and Appellant.

Thomas Kathe, City Attorney, Burke, Williams & Sorensen, Michele R. Vadon-Rivera and Scott F. Field for Defendant and Appellant.

John L. Dodd as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**SONENSHINE, J.**—The City of Costa Mesa (the City) appeals a judgment setting aside its administrative decision to deny Jeffrey Harris a conditional

use permit for an accessory apartment. The City contends the trial court ignored the substantial evidence supporting the city council's discretionary decision and, in the alternative, should have remanded the matter to the council for a new hearing.

I

Harris owned a small 869-square-foot home on Flower Street in Costa Mesa, a residential area dating back to 1947 which is designated on the City's general plan as low-density residential. In 1991, Harris contacted the City for permission to raze his detached garage, facing on an alley, and erect a two-story building—a three-car garage with carport below and an apartment above. The 1,199-square-foot living area was to contain one bedroom, a study, living room, dining room and two bathrooms. A balcony overlooked the alley.

The City's zoning administrator approved the plan. However, a coalition of neighbors appealed his decision to the planning commission which conducted a public hearing. Despite a report from the senior planner,[1] the commission denied the conditional use permit (CUP), finding the proposed apartment was incompatible with the existing neighborhood.

Harris appealed to the city council. The report from the city staff again recommended approval of the CUP, stating applicable state law deemed accessory apartments consistent with underlying general plans and, in any event, the Harris property was a part of the east side of Costa Mesa which already contained some accessory apartments. The neighbors strongly disagreed, maintaining the "neighborhood" was merely the 140-home area around the Harris residence and the proposed project was too large for that area (30 percent larger than the existing home), and would impede the view and infringe on the neighbors' privacy.

Following the public hearing, the council voted 5-0 to affirm denial of the CUP. The clerk's memorandum of the council action stated, "The Planning Commission denial of Zoning Action AZ-91-06 was upheld, based on the finding that the project would have an adverse impact on the public health, safety and welfare, and therefore would be inconsistent with the General Plan."

Harris filed a writ of mandate in superior court. The trial court concluded "the City Council's findings of fact adopted orally at the City Council

---

[1]The report stated, "The proposed accessory apartment satisfies all development standards in effect at the time of its approval."

hearing and formally confirmed in writing, that the project was injurious to the health, safety and welfare of the City, was not supported by substantial evidence in light of the whole record." It issued the writ, setting aside the council decision and stating remand "is not necessary or appropriate in light of, among other things, the administrative record and findings of fact below."

## II

### APPLICABLE STATUTES AND ORDINANCES

Government Code section 65852.2, operative July 1, 1983, outlines the procedures "for the creation of second units in single-family and multifamily residential zones . . . ." In particular, a city may pass its own ordinance, consistent with section 65852.2, setting standards for those units and requiring a CUP,[2] or it may do nothing, subjecting itself to the stricter standards outlined in subdivision (b) of the statute. Subdivision (b) outlines "maximum

---

[2]All statutory references are to the Government Code unless otherwise noted.

Section 65852.2, subdivision (a) provides: "Any local agency may, by ordinance, provide for the creation of second units in single-family and multifamily residential zones consistent with all of the following provisions: [¶] (1) Areas may be designated within the jurisdiction of the local agency where second units may be permitted. [¶] (2) The designation of areas may be based on criteria, which may include, but are not limited to, the adequacy of water and sewer services and the impact of second units on traffic flow. [¶] (3) Standards may be imposed on second units which include, but are not limited to, parking, height, setback, lot coverage, architectural review, and maximum size of a unit. [¶] (4) A local agency may find that second units do not exceed the allowable density for the lot upon which the second unit is located, and that the second units are a residential use that is consistent with the existing general plan and zoning designation for the lot. [¶] (5) The second units created shall not be considered in the application for any local ordinance, policy, or program to limit residential growth. [¶] (6) A local agency may establish a process for the issuance of a conditional use permit for second units."

Subdivision (b) outlines the criteria for those agencies not adopting their own ordinances, and states: "Notwithstanding Section 65901 [providing for hearings on applications for CUP's, allowing the local agencies to establish their own criteria], every local agency shall grant a special use or a conditional use permit for the creation of a second unit if the second unit complies with all the following: [¶] (1) The unit is not intended for sale and may be rented. [¶] (2) The lot is zoned for single family or multifamily use. [¶] (3) The lot contains an existing single-family dwelling. [¶] (4) The second unit is either attached to the existing dwelling and located within the living area of the existing dwelling or detached from the existing dwelling and located on the same lot as the existing dwelling. [¶] (5) Any increase in the floor area of an attached second unit shall not exceed 30 percent of the existing living area. [¶] (6) The total area of floor space for a detached second unit shall not exceed 1,200 square feet. [¶] (7) Any construction shall conform for height, setback, lot coverage, architectural review, site plan review, fees, charges, and other zoning requirements generally applicable to residential construction in the zone in which the property is located. [¶] (8) Local building code requirements which apply to detached dwellings, as appropriate. [¶] (9) Approval by the local health officer where a private sewage system is being used, if required. [¶] No other local ordinance, policy, or regulation shall be the basis for the denial of a

standards" and "[n]o additional standards, other than those provided in this subdivision [(b)] or subdivision (a), shall be utilized or imposed . . . ." The third alternative, subdivision (c), allows a city to ban second units entirely pursuant to certain specified findings. (See *Wilson* v. *City of Laguna Beach* (1992) 6 Cal.App.4th 543, 553 [7 Cal.Rptr.2d 848].)

In response, the City passed an ordinance outlining its own concerns (requiring owner-occupancy to protect neighborhood stability and establishing a maximum size to ensure the addition's "subordinate nature"). The ordinance also states: "A second unit as provided for herein, if located on a conforming lot, does not exceed the allowable density for the lot and is a residential use, consistent with the General Plan Designation and applicable zoning." The ordinance then provided amendments to the Costa Mesa Municipal Code (CMMC). Those amendments allow the construction of accessory apartments if the zoning administrator grants a minor conditional use permit and the structure complies with section 13-131 of the planning, zoning and development code. CMMC section 13-131 provides: "Accessory apartments may be approved as a minor conditional use permit. Accessory apartments shall meet the criteria specified in Section 65852.2 of the California Code and the following criteria [not applicable here]."[3]

CMMC section 13-347, entitled "Findings Necessary to grant Conditional Use Permit," provides: "When granting a conditional use permit the planning commission shall find that the evidence presented substantially meets the following conditions: [¶] (a) The proposed development or use is substantially compatible with developments in the same general area and would not

---

building permit or use permit under this subdivision. [¶] This subdivision establishes the maximum standards that local agencies shall use to evaluate proposed second units on lots zoned for residential use which contain an existing single-family dwelling. *No additional standards, other than those provided in this subdivision or subdivision (a), shall be utilized or imposed,* except that a local agency may require an applicant for a permit issued pursuant to this subdivision to be an owner-occupant. [¶] This section does not limit the authority of local agencies to adopt less restrictive requirements for the creation of second units. [¶] A second unit which conforms to the requirements of this subdivision shall not be considered to exceed the allowable density for the lot upon which it is located, and shall be deemed to be a residential use which is consistent with the existing general plan and zoning designations for the lot."

Subdivision (c) provides: "No local agency shall adopt an ordinance which totally precludes second units within single family and multifamily zoned areas unless the ordinance contains findings acknowledging that the ordinance may limit housing opportunities of the region and further contains findings that specific adverse impacts on the public health, safety and welfare that would result from allowing second units within single-family and multifamily zoned areas justify adopting the ordinance."

[3]The added requirements are (1) one unit on the property must be owner-occupied, (2) an attached accessory apartment cannot exceed the lesser of 640 square feet or 40 percent of the total area of the structure, and (3) parking must be provided.

be materially detrimental to other properties within the area. [¶] (b) The granting of the conditional use permit will not be materially detrimental to the health, safety and general welfare of the public or otherwise injurious to property or improvement within the immediate neighborhood. [¶] (c) The granting of the conditional use permit will not allow a use, density or intensity which is not in accordance with the general plan designation for the property."

Our review of an administrative decision requires that we "scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) "Moreover, '[c]ourts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency.' [Citation.]" (*Lindborg-Dahl Investors, Inc.* v. *City of Garden Grove* (1986) 179 Cal.App.3d 956, 961, fn. 7 [225 Cal.Rptr. 154], italics added.) To this end, we "consider the entire record to determine whether substantial evidence supports the city council's findings and whether those findings support its decision." (*Id.* at p. 961, fn. omitted.)

## III

### FINDINGS OF THE CITY COUNCIL

Following the presentation of evidence by approximately 10 neighbors opposing the project (and the asserted agreement of 47 out of 57 homeowners in the 300-foot-radius area contacted by the City), 2 residents who approved, Harris, and his architect, the council members presented their conclusions and/or findings. Mr. Humphrey noted the continuing encroachment into single-family neighborhoods, stating, "If you look at the Code, I don't think that we *shall*, if we find that it is incompatible, I think we *may* approve or disapprove." He particularly emphasized the present consistency of the neighborhood and the need to protect single-family neighborhoods: "What that means to me is *not* that an accessory apartment is inappropriate unless, of course, [there is] a significant change of the neighborhood [which] allows for greater use of a multi-family dwelling to a level that is inconsistent with that neighborhood." He observed that the project per se was "nicely done," entailing a great deal of time and effort. However, he continued, "I do think, quite honestly, that that project does overshadow this neighborhood and does become an inconsistent use within the neighborhood both to the

existing general plan and to the CUP process." He moved to uphold denial of the permit.

The motion was seconded by Ms. Genis, who emphasized the overall infringement upon the privacy of the surrounding residents: "And one of the findings that we are asked to make in the approval of any use permit is that it would not be detrimental to other properties in the area in that it would not be detrimental to the health, safety and welfare of the public or otherwise injurious to property improvements within the immediate neighborhood." She noted all windows of the living quarters were, indeed, on the second floor and "would tend to create a greater tendency for invasions of privacy," continuing, "And it also is not in character with the rest of the neighborhood [which] is typically low level. And, therefore, I couldn't say that this project, as proposed, would not be detrimental to the surrounding neighborhood."

Councilman Buffa, in supporting the motion, noted the letter from the proponent of the state legislation, who strongly stated that it was *not* the intent of the legislation to allow accessory apartments that were larger than the primary residence.

The mayor then asked the city attorney if *additional* findings were necessary. Said the attorney, "You would need to make a finding with reference to the existing general plan. And number two, I believe that one of the only bases that you can find to deny the project is that there are adverse impacts on the public health, safety and welfare that would result from allowing second units within a single-family area. And that's about the only way you can deny it, or at least uphold the Planning Commission's action."

Humphrey then added, "I think that adverse effects to the welfare of the neighborhood would make it inconsistent so I would certainly include those findings within my motion." The seconder agreed. The mayor stated, "This is a unique neighborhood in Costa Mesa and I do believe that there are other places where this accessory apartment would be more compatible."

■ We first note the City's objection to the trial court's reliance solely on the wording of the clerk's notice of denial, i.e., the only finding was "that the project would have an adverse impact on the public health, safety and welfare, and thereby would be inconsistent with the General Plan." We agree with the City. There were other reasons given by the council members which were not specifically articulated in the memorandum. That, however, is not dispositive, despite the fact it was the "official" notice to Harris. "Written findings are not the sole means by which *Topanga*'s [*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra*, 11 Cal.3d 506] requirements may be satisfied." (*Lindborg-Dahl Investors, Inc.* v. *City of Garden*

*Grove, supra,* 179 Cal.App.3d 956, 963.) "In addition to the findings stated in the council's resolution, we look to the transcript of the hearing for statements made by the council members. It is proper to look for findings in oral remarks made at a public hearing at which both parties were present, which was recorded and of which a written transcript could be made." (*Id.* at p. 963, fn. 9.)[4]

Based on the hearing transcript, it is clear the council based its decision, in the majority, on the incompatibility of the structure with the particularly unique tract area on Flower Street. The proposed edifice was two stories high, not objectionable standing alone under the building code. However, it was not a two-story *home* but an added building quite near the alley, which the balcony overlooked, allowing a view into the backyards of several other residences. It "overshadowed" the neighborhood, thus becoming an inconsistent use. This placement raised a privacy issue, "injurious to property improvements within the immediate neighborhood." The project was "not in character with the rest of the neighborhood." It was half again larger than the primary residence. Humphrey summed it up: The "adverse effects to the neighborhood would make it inconsistent."

As outlined orally, the findings negate granting a CUP to Harris: first, under subdivision (a) of CMMC section 13-347, because the project is *not* substantially compatible with developments in the area; second, under subdivision (b), the project *would* be, for this reason, "injurious to property or improvement within the immediate neighborhood."

Because the CUP requirements are cumulative, rather than in the alternative, the failure to meet the standards of any one of the three is fatal to the petition. For this reason, there need not be a finding the "use, density or intensity . . . is not in accordance with the general plan designation for the property."[5] In *Guinnane* v. *San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732 [257 Cal.Rptr. 742], the appellant argued "that because he complied with the city's zoning laws and building codes, he was entitled to the permit as a matter of right." (*Id.* at p. 736.) Not so, said the court, "[T]he

---

[4]For this reason, we do not dwell on Harris's citation to *J. L. Thomas, Inc.* v. *County of Los Angeles* (1991) 232 Cal.App.3d 916 [283 Cal.Rptr. 815], where the City relied upon one ordinance at the hearing and another on appeal. There were no findings relevant to the one relied upon and the reviewing court could not imply those necessary to uphold the decision under the second ordinance.

[5]Ordinance No. 85-29 did essentially deem a second unit "a residential use" which would not "exceed the allowable density" under the general plan. It did not give an accessory apartment wholesale compliance with the general plan, i.e., the City retained discretion to deny a CUP where the unit was incompatible with or injurious to the surrounding area. Only if there had been no ordinance adopted by the City would the mandatory requirements of section 65852.2, subdivision (b) come into play.

city, acting through the planning commission and the board of permit appeals, was empowered to exercise discretionary review and to determine that the proposed residential development was unsuitable for the indicated location." (*Ibid.*)

## IV

### SUFFICIENCY OF THE EVIDENCE

■ While the trial court found there was insufficient evidence to support the written findings of the council, we are in no way bound by that determination. First, the trial court failed to consider the full array of oral findings. ■ Second, "we must examine the findings made by the [council] itself to determine whether they were supported by substantial evidence, rather than limiting ourselves to a review of the findings made by the trial court." (*Desmond* v. *County of Contra Costa* (1993) 21 Cal.App.4th 330, 335 [25 Cal.Rptr.2d 842].)

Here, the CUP ordinance requires certain findings be made before a permit may be granted: (1) the proposed development is compatible with the area, (2) granting the permit would not be detrimental to general welfare of the area or injurious to property within the immediate neighborhood, *and* (3) granting the permit would not allow a use, density or intensity incompatible with the general plan. The failure to find *any one of these* will cause a denial of the permit.

■ Harris argues at length that the project permit must be granted because the only basis for denying it was the neighborhood resistance to multi-family dwellings in an otherwise single-family zone; and the City's own ordinance mandates agreement with the general plan for accessory apartments. Two points. First, there were, as discussed above and below, *several* reasons underlying the inconsistency finding which did not relate merely to multifamily use. Second, the wording of the ordinance referred to deems compliance with the general plan only as to residential use and density. It does not require, as Harris insists, that every project be accepted.[6] The CUP section has two other prerequisites that must be met. Either of those, where there are negative findings which are supported by substantial evidence, will support denial of the CUP. Otherwise, any application, regardless of placement, shape or appearance would require automatic acceptance, merely because it was an accessory apartment of proper square

---

[6]He argues on appeal, as he did below, "The point I'd like to make really has been made for me and it's been made by your zoning staff: 'Although many of the homeowners in the area oppose the project, state law and city ordinance in effect at the time mandated approval.' I really believe . . . that that says it all. . . . [A]ccessory apartments are considered or deemed consistent with the general plan and zoning designation for the lot. Now that's all I have to say."

footage. This clearly was not the intention of the statute or the ordinance. Section 65852.2, subdivision (a) specifically allows cities to provide their own ordinances for the creation of second units, in which they may find those units do not exceed the allowable density and are for a residential use (which the City did find) *and* for which the city may establish a CUP process (which the City also did). Moreover, it is clear that the apartment was found inconsistent, not primarily because it added another family, but because of the size of the two-story unit, the placement of the living quarters on the second level, and the manner in which it overlooked the other residential backyards. In fact, one council member stated the project might have been perfectly acceptable had it been one story or had it been requested for a different area. Thus, it is not second units in general that are unacceptable under the CUP requirements, but this particular project.

The council members found the project inconsistent with the neighborhood: It "does overshadow this neighborhood and does become an inconsistent use within the neighborhood both to the existing general plan *and* to the CUP process." It was detrimental to the welfare and otherwise injurious to the immediate area because it tended "to create a greater tendency for invasions of privacy" and was "not in character with the rest of the neighborhood." Even if the enabling ordinance recognized the residential use and density change were compatible with the general plan, the other two CUP requirements were *not found.*

Sufficient evidence to support those determinations can be found in the presentations by the neighborhood coalition which opposed the project. ■ And we emphasize that "expert testimony on these issues is not necessary. It is appropriate and even necessary for the [agency] to consider the interest of neighboring property owners in reaching a decision whether to grant or deny a land use entitlement, and the opinions of neighbors may constitute substantial evidence on this issue. [Citations.]" (*Desmond* v. *County of Contra Costa, supra,* 21 Cal.App.4th 330, 337.)

One 40-year resident, a real estate broker, strongly objected to the presence of a second-story apartment with a balcony from which one could look into six other backyards: "I'm not saying that he would even do that. But that is a lack of privacy. And when you have a lack of privacy, you have a lowering in value in the surrounding properties. Take it from me—eighteen years in real estate, I know, as a matter of fact, from experience." He noted that although there were a few other apartments in the 350-home tract, they were "grandfathered in" and none of them were 2-story and above a garage. He stated that the present neighborhood of older homes was "our very nice, quaint little neighborhood." And "one of the reasons the east side is more

expensive than the other real estate in Costa Mesa is because of that fact and the location of the property, that they liked the old charm of the east side."

At least 10 other neighbors spoke in opposition to the project, raising here as they did before the planning commission (whose report and transcript were available to the council) their concerns about the incompatibility of the project with the area. Said one of them, "If you drive down the alleys, there aren't any two-story structures directly on the alleys. This project is very close to the alley. It think it's very formidable in nature." He agreed with the planning commission's statement: The project is incompatible and the permit must be denied "to protect the existing stabilized residential neighborhoods from the encroachment of incompatible or potentially disruptive uses." Others decried the "giant duplex" in their midst.[7]

Many of the other objecting neighbors ceded their time to a Ms. McKinley who presented a united presentation on the coalition's behalf. She emphasized the size of the apartment, how it overlooked other yards, and was a massive intrusion in an otherwise specialized small, but lovely, area of Costa Mesa. She noted, "The constituents of this neighborhood have plainly expressed their views about the potential of this singular project on their neighborhood. They are concerned. They do not want it built." She showed a series of slides taken from various angles, showing the surrounding homes and the impact the proposed project would have upon them, as well as the singular lack of any other project approaching the scope or interference of the Harris apartment. Throughout the 400 block of Flower Street, where the proposed project would be built, the homes are all one-story: "We are asking only that you as a Council recognize the valid findings of your Planning Commission that this project is not compatible with the neighborhood and that it is inconsistent with the general plan."

The *Desmond* court faced a similar charge of insufficiency of the evidence to support an agency's denial of a use permit. The pivotal finding "stat[ed] that '[a] second unit is not suitable in this location, is out of character with the surrounding neighborhood and would be an intrusion into the neighborhood . . . .' " (*Desmond* v. *County of Contra Costa, supra,* 21 Cal.App.4th 330, 337.) Although not articulating any particular ordinance requirement (such as architectural compatibility, adverse effect on preservation of property values and effect on general welfare), the finding was "actually a

---

[7]One neighbor, at the planning commission hearing, voiced his objections, noting that 47 of the 57 families contacted did not approve of the project; the other 10 could not be reached, as they were absentee owners. He stated, "There must be a reason for notifying us, and we're telling you loud and clear what we feel about it."

summation of several of them. It articulates various significant elements necessarily included in the general concept of public welfare . . . ." (*Id.* at p. 338.) "It is well established that the concept of public welfare encompasses a broad range of factors, including aesthetic values as well as monetary and physical ones, and that a concern for aesthetics and 'character' is a legitimate governmental objective." (*Id.* at pp. 337-338.)

■ Here, as in *Desmond*, "[t]here was ample evidence of community concern with the impact of a residential second rental unit on the general aesthetic character of the neighborhood, as well as on . . . protection of property values. These concerns were repeatedly expressed by neighbors opposing the application." (21 Cal.App.4th at p. 339.) The planning commission and the council heard and considered these opinions, which themselves provide the requisite substantial evidence to support the findings of the council.

The plaintiff in *Guinnane v. San Francisco City Planning Com., supra,* 209 Cal.App.3d 732 contended ". . . the commission's decision is unsupported by the findings [ ] based on the argument that the findings relate exclusively to the private concerns of the neighbors (traffic, parking and visual impact) rather than the requisite public concerns of health, safety and welfare. [¶] This argument is specious. While parking, traffic and visual impact were problems expressed by some of the neighbors, clearly they represent concerns that fall well within the domain of the public interest and welfare. [Citations.]" (*Id.* at p. 743.) "Such concerns for aesthetics have long been vindicated as legitimate governmental objectives. 'The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U.S. 421, 424 [96 L.Ed. 469, 472-473, 72 S.Ct. 405]. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.' [Citations.]" (*Id.* at p. 741.)[8]

---

[8]Because we reverse, Harris's appeal seeking attorney fees under section 800 is moot.

We also note that changed circumstances may give Harris another chance. A portion of oral argument centered on the primary residence presently on the lot. A fire destroyed the original house, extant at the time of the hearings, and it has been replaced, allegedly with a larger structure. Whether this might affect the planning commission's and city council's decision (what weight was given to the ratio between the square footage of the house and that of the proposed second story unit) is not before us. Nonetheless, although redesign seems the most judicious avenue of approach, he is not precluded from reinitiating the permit process on this basis.

The judgment is reversed. The court is directed to enter a new judgment denying the writ of mandate.

Wallin, Acting P. J., and Crosby, J., concurred.