[No. E021721. Fourth Dist., Div. Two. Sept. 22, 1999.]

REDEVELOPMENT AGENCY OF THE CITY OF LONG BEACH,
Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants;
METROPOLITAN WATER DISTRICT et al., Real Parties in Interest.

## COUNSEL

De Witt W. Clinton and Lloyd W. Pellman, County Counsel, and Thomas M. Tyrrell, Principal Deputy County Counsel, for Defendants and Appellants.

Alan K. Marks, County Counsel (San Bernardino) and Kevin L. Norris, Deputy County Counsel, for County of San Bernardino and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Trevor Grimm and Richard D. Gann for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Defendants and Appellants.

Robert E. Shannon, City Attorney, Heather A. Mahood, Assistant City Attorney; McDonough, Holland & Allen, Richard E. Brandt and T. Brent Hawkins for Plaintiff and Respondent.

James K. Hahn, City Attorney (Los Angeles) and Dov S. Lesel, Assistant City Attorney, for the Community Redevelopment Agency of the City of Los Angeles as Amicus Curiae on behalf of Plaintiff and Respondent.

No appearance for Real Parties in Interest.

## OPINION

**WARD, J.**—This appeal arises out of a tug-of-war between defendant and appellant Los Angeles County (the County)[1] and plaintiff and respondent Redevelopment Agency of the City of Long Beach (the Redevelopment Agency) over incremental tax revenues generated by county property taxes on properties within the area subject to the redevelopment project. The trial court below ordered the County to lower its base tax rolls for the measuring

---

[1] Alan T. Sasaki, as Auditor Controller of Los Angeles County, Kenneth P. Hahn, as Assessor of Los Angeles County, and the Los Angeles County Flood Control District, as a taxing agency like the County, were also named as defendants below and are appellants on appeal. For convenience, references to the County in this opinion are understood to apply equally to the other named defendants and appellants.

year, effectively transferring to the Redevelopment Agency the incremental property taxes, above the readjusted base, within the redevelopment area for all succeeding years.

The County appeals, contending the trial court improperly ordered the base year tax rolls reduced. Based on our construction of the relevant provisions of the California Constitution, the Revenue and Taxation Code, and the Health and Safety Code, we conclude that the trial court improperly ordered the alteration to the base year tax rolls. Accordingly, we reverse.

FACTS AND PROCEDURAL HISTORY

*Background of Redevelopment Projects and Tax Increment Financing*

A constitutional provision for financing redevelopment projects to relieve urban blight was originally adopted in California in 1952. (See Cal. Const., former art. XIII, § 19, now art. XVI, § 16.) Under these provisions, redevelopment projects are financed by the "tax increment financing" method.

All taxable property within the area to be redeveloped is subject to ad valorem property taxes. The properties lying within a redevelopment area have a certain assessed value as of the date a redevelopment plan ordinance is adopted. A local taxing agency, such as a city or county, continues in future years to receive property taxes on the redevelopment area properties, but may only claim the taxes allocable to the base year value. If the taxable properties within the redevelopment area increase in value after the base year, the taxes on the increment of value over and above the base year value are assigned to a special fund for the redevelopment agency.

Once the redevelopment plan is adopted, the redevelopment agency may issue bonds to raise funds for the project. As the renewal and redevelopment is completed, the property values in the redevelopment area are expected to rise. The taxes attributable to the increase in assessed value above the base year value are assigned to the redevelopment agency, which then uses these funds to retire the bonds. The local taxing agencies still receive taxes attributable to the base year assessed value of the properties within the redevelopment area. This way, the redevelopment project in effect pays for itself. (*Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133]; *Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 432-438 [31 Cal.Rptr. 92].)

The crux of the problem here is how to assign the base year value for the properties within the redevelopment area. If the base year value is low, then

any augmented value in later years generates more tax increment moneys for the redevelopment agency. If the base year value is high, the property values in later years must increase above that higher level to produce any increment taxes for the redevelopment agency. Naturally, among possible values, the County argues for a higher base year value, and the Redevelopment Agency argues that a lower base year value should be applied.

Article XVI, section 16 of the California Constitution provides the formula for dividing the tax revenues between the taxing agencies and the redevelopment agency:

"(a) That portion of the taxes which would be produced by the rate upon which the tax is levied each year by or for each of [the relevant] taxing agencies upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of that property by the taxing agency, last equalized prior to the effective date of . . . [the] ordinance [adopting the redevelopment plan], shall be allocated to, and when collected shall be paid into, the funds of the respective taxing agencies . . . ; and

"(b) . . . that portion of the levied taxes each year in excess of such amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on [e.g., bonds, loans, or other funds used to finance the redevelopment project]. . . ."

Pursuant to the powers granted to the Legislature in the constitutional provisions, the Legislature has enacted the Community Redevelopment Law, which repeats language virtually identical to that quoted above. (See Health & Saf. Code, §§ 33670, 33671.) The present dispute arose out of the proper interpretation of the phrase, "assessment roll . . . last equalized prior to the effective date of [the redevelopment plan] ordinance . . . ."

*The Long Beach Project*

After the civil disturbances in Los Angeles County in April and May of 1992,[2] the Legislature passed special legislation permitting redevelopment in specified areas of Long Beach and Signal Hill. (See Stats. 1992, ch. 1253,

---

[2]I.e., riots following the verdict acquitting police officers of criminal charges in the Rodney King beating case.

§§ 1-7, pp. 5987-5991.)[3] The Long Beach City Council adopted a redevelopment plan for the affected areas on September 21, 1993. The parties both argue that the 1993-1994 tax roll year is the base year applicable to this case. In 1995, however, the Redevelopment Agency raised questions about how the base roll was to be defined. The Redevelopment Agency asked the County, the relevant taxing agency, to reduce the base year values for certain properties in the redevelopment area, based on resolved assessment appeals. That is, some property owners had filed appeals of the assessed values of their properties for the 1993-1994 tax year. As a result of a number of successful appeals, the County's assessment appeals board had made determinations reducing the originally stated assessment value for the 1993-1994 year. The Redevelopment Agency argued that the reductions in assessed value after the assessment appeals should reduce the base roll values for purposes of measuring the tax increment allocable to the Redevelopment Agency.

The County refused to reduce the base year assessment roll and the Redevelopment Agency filed a petition for writ of mandate in the Los Angeles County Superior Court. The matter was transferred from Los Angeles County to San Bernardino County pursuant to Code of Civil Procedure section 394.

The court below ruled in favor of the Redevelopment Agency and issued the requested writ. The writ commands the county auditor and assessor to "reduce the sum of the 1993-1994 assessed values of property within the [redevelopment project area] used as the base roll for purposes of computing the allocation of project area tax revenues between the special fund of the [Redevelopment] Agency and the taxing agencies by the amount of the assessed values eliminated from the final equalized assessment roll for 1993-1994 as a result of the resolution of assessment appeals affecting the 1993-1994 assessment roll, and . . . [t]o allocate and pay revenues to the special fund of the [Redevelopment] Agency and the taxing agencies for each year after October 23, 1993, based on the [base roll as reduced by all resolved assessment appeals.]"

The County appeals, contending that the reduction in the base roll assessed values gives the Redevelopment Agency an unfair share of tax revenues for the project area. Further, the County argues that the proper base roll is the assessment roll, prepared annually each August, issued in August of 1993, and not the adjusted assessment roll made later in the tax year.

---

[3]We take judicial notice of this authorizing legislation, as requested by the Redevelopment Agency.

The Redevelopment Agency argues, in turn, that the trial court properly issued the writ, as the relevant provisions of the Community Redevelopment Law (Health & Saf. Code, § 33670) and the Revenue and Taxation Code require the base year assessment roll to be measured by the final and adjusted tax roll, not the initial August 1993 roll.

We conclude that the "assessment roll . . . last equalized prior to the effective date of . . . [the] ordinance" adopting the redevelopment plan, means exactly what it says: i.e., that the August assessment in 1993 was the "roll . . . last equalized" before the effective date of the redevelopment plan ordinance; the changes in assessed values for the 1993-1994 tax year resulted in a later "last equalized" assessment roll, but the later assessment roll was "last equalized" *after*, and not prior to, the adoption of the redevelopment plan ordinance.

## ANALYSIS

### I. *Standard of Review*

We are here presented with questions of constitutional and statutory construction. Generally speaking, "[r]ules of construction and interpretation that are applicable when considering statutes are equally applicable in interpreting constitutional provisions. [Citation.]" (*County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 979 [156 Cal.Rptr. 777].) "The proper interpretation of statutory," or, we may add, constitutional, ". . . language is a question of law which this court reviews de novo, independent of the trial court's ruling or reasoning. [Citations.]" (*Plunkett* v. *Spaulding* (1997) 52 Cal.App.4th 114, 126 [60 Cal.Rptr.2d 377].) Accordingly, we apply the de novo standard here.

### II. *The Assessment Roll "Last Equalized" Before the Adoption of the Redevelopment Project Ordinance Was the August 1993 Roll*

The County urges in part that the writ commanding it to reduce its 1993-1994 base year assessment roll by the amounts of assessment appeal reductions is erroneous because it results in unfairness to the County as a taxing agency.

In this portion of its argument, the County essentially mounts an attack on the fundamental validity of tax increment financing. The County appears to argue that if, in practice, increases in property values, which generate tax increment moneys, are attributable to economic forces, such as price inflation, rather than directly to the redevelopment project's relief of blight or its

rebuilding in the area, then it is unfair for a redevelopment agency to reap the benefits of that tax increment. The County argues, for example, that "[t]he rationale that tax increment financing would 'pay for itself' is based on two unconsidered assumptions: (1) that the agency's activities *cause* all the increases in property tax assessments; and (2) that there is no general inflation (nor deflation) of property values."

The County's argument, which seeks to undermine the empirical assumptions of tax increment financing, is addressed to the wrong institution. The Legislature may or may not have made the assumptions ascribed to it by the County. The Legislature may have deemed some seeming inequity tolerable. The taxing agencies are guaranteed at least as much tax revenue from the redevelopment-area properties as they would receive in the base year; even if the tax increment over and above that amount is due in part to inflationary factors rather than solely on account of the revitalization from redevelopment, the Legislature may have determined that the faster rising increment would more quickly retire the redevelopment bonds. Such judgments, including the enactment of redevelopment reform measures the County alludes to in its briefs, lie in the province of the Legislature and not with this court.[4]

The County next argues that the trial court improperly granted the writ, because it misconstrued the meaning of the relevant statutory and constitutional provisions.

As we have previously noted, the crux of the problem here is the determination of the assessment roll last equalized before the redevelopment plan was adopted. In 1965, after the constitutional and statutory redevelopment law provisions were enacted, the Legislature added definitional provisions to the Revenue and Taxation Code concerning the meaning of the assessment roll last equalized. (See Stats. 1965, ch. 219, § 1, p. 1189.) The relevant provisions here are Revenue and Taxation Code sections 2050, 2052, and 2055.

Revenue and Taxation Code section 2050 states in pertinent part: "Whenever . . . the State Constitution, [or] any law . . . makes reference to the

---

[4]The County points out, for example, that after limitations on property taxes were established under Proposition 13, cities in particular have been seeking out mechanisms to compensate for diminished funding. Some cities may have undertaken redevelopment projects to capture tax increment financing revenues, that otherwise would have gone to the taxing agencies, by stretching the concept of blight beyond its original intention. The Legislature has apparently enacted some reforms to, e.g., place tighter strictures around the definition of "blight," and set time limits on the redevelopment agencies' ability to incur debt. (See Health & Saf. Code, § 33607.5.)

'last equalized county assessment roll' in those words or in similar words, or in any words intended to refer to the latest or current assessment roll of the county, such roll . . . shall be ascertained in accordance with the rules provided in this chapter."

Revenue and Taxation Code section 2052 provides: "The local roll as delivered to the auditor . . . together with the board roll as transmitted to the auditor . . . and the estimate with any changes . . . shall become the last equalized roll on August 20, and such rolls together shall continue to be the last equalized roll, except as otherwise provided in this chapter, (a) for the purpose of computing any debt limit for the issuance of bonds of any public entity that is based on a percentage of assessed valuation as shown on the last equalized assessment roll, and (b) for all other purposes, until the assessment roll for the following year becomes the last equalized roll in accordance with the provisions of this section."

Revenue and Taxation Code section 2055 provides for an "except[ion] as otherwise provided in this chapter" pursuant to Revenue and Taxation Code section 2052: "If the county . . . assessment appeals board . . . makes any changes in the local roll . . . and including any other changes in the local roll made pursuant to law, together with the board roll as transmitted to the auditor . . . and the estimate with any changes transmitted . . . , shall become the last equalized roll on the third day after the final adjournment of the . . . assessment appeals board[] . . . , except for the purpose of computing any debt limit referred to in Section 2052."

California Constitution, article XVI, section 16, as well as the parallel provisions of Health and Safety Code section 33670, measures the respective shares of the taxing and the redevelopment agencies by express reference to the "total sum of the assessed value of the property in the redevelopment project as shown upon the *assessment roll* used in connection with the taxation of that property by the taxing agency, *last equalized* prior to the effective date of the [redevelopment plan] ordinance . . . ." (Italics added.) The italicized language clearly "makes reference to the 'last equalized county assessment roll,'" or similar language, thus invoking the definition of the "last equalized roll" under Revenue and Taxation Code section 2050 et seq.

No published cases have construed Revenue and Taxation Code section 2050 et seq. in the context facing us here, but we find an opinion of the Attorney General helpful. The City of Riverside had adopted a redevelopment plan ordinance which became effective on December 16, 1971. The

question was whether the 1970-1971 assessment roll or the 1971-1972 assessment roll was to be used as the base year assessment roll. The Attorney General construed Revenue and Taxation Code section 2050 et seq. to require the 1971-1972 August tax roll to be used as the base year roll: "Section 2052 expressly states that the *roll in existence on the August date* is the last equalized roll and *continues* as such except as otherwise provided in that chapter (meaning section 2055, for example). If that roll is subsequently changed in accordance with section 2055, the changed roll will become the last equalized assessment roll. The changed roll does not relate back to the August date; it succeeds the August roll as the new last equalized assessment roll for that year. This amended roll then continues as the last equalized assessment roll until the following August date when the last equalized assessment roll for the subsequent year is determined in accordance with section 2052. The cycle then starts anew. [¶] . . . [¶] It is concluded, therefore, that for all other purposes the roll in existence on the August date becomes the last equalized assessment roll and continues as such unless it is changed by a county assessment appeals body. If a change occurs, then the original roll ceases to be the last equalized assessment roll and the changed roll becomes the new last equalized assessment roll *on the third day after the adjournment of the county assessment appeals body* [italics added] and continues as such until there is delivered to the auditor the roll for the following year on the August date prescribed in section 2052. [¶] Accordingly, . . . since the 1971-72 roll was in existence on the . . . August [date in] 1971, it was the last equalized assessment roll as of the date the project became effective [in December of 1971]." (*Dates for Last Equalized Assessment Roll*, 56 Ops.Cal.Atty.Gen. 184, 189 (1973), italics added.)

Here, the Redevelopment Agency has emphasized the language between the words "assessment roll . . . last equalized," and argued that the August roll should not be deemed the last equalized 1993-1994 roll because it was not the roll ultimately "used in connection with the taxation of that property by the taxing agency." That is, because there *were* ultimate changes in the assessment roll, such that a new 1993-1994 assessment roll succeeded the August roll, as the Attorney General's opinion has described, the August roll cannot be considered the last equalized roll for 1993-1994.

While it is true that there may ultimately be changes in any given year after the August assessment roll has been delivered to the auditor, the Redevelopment Agency's interpretation fails to take account of all the relevant statutory and constitutional language.

California Constitution, article XVI, section 16 requires the formula for dividing tax revenues to be based upon the "assessment roll . . . last

equalized *prior to the effective date of the* [redevelopment plan] *ordinance . . . .*" (Italics added.) Health and Safety Code section 33670 is identical in this respect. Obviously, the terms "prior to" and "effective date" refer to a date certain. Revenue and Taxation Code section 2055 provides that an assessment roll which is amended as a result of assessment appeals "*shall become* the last equalized roll *on the third day after the final adjournment*" of any assessment appeals body. (Italics added.) This also refers to a date certain.

No one has even suggested that the County's assessment appeals board for the 1993-1994 tax year adjourned at any time before September 21, 1993, the date upon which the redevelopment plan here became effective. The 1993-1994 tax year assessment appeals, which are at the center of this controversy, were not resolved until long after the effective date of the ordinance adopting the redevelopment plan. Changes to reflect assessment appeals were not part of any last equalized assessment roll until three days after the 1993-1994 assessment appeals body had finally adjourned for the year. Therefore, the adjusted 1993-1994 assessment roll, as opposed to the August assessment roll, was not and cannot have been the assessment roll last equalized prior to September 21, 1993.

To hold otherwise is to read out of existence the express language of Revenue and Taxation Code section 2052, which provides that the August roll "*shall become the last equalized roll* on August 20, and . . . *shall continue to be the last equalized roll*, except as otherwise provided . . . .*" This language, together with the language of Revenue and Taxation Code section 2055, that the adjusted roll "shall become" the new "last equalized roll" only after the assessment appeals board has finally adjourned for the year, could hardly be more clear that the August roll fully qualifies as the last equalized roll until it is changed.

The Attorney General's opinion recognizes the status of the August roll as a proper last equalized roll. Indeed, as the Attorney General points out, the statutory language plainly indicates that the adjusted roll does not relate back to the August date, but succeeds it as a new last equalized roll for that tax year. (56 Ops.Cal.Atty.Gen., *supra*, at p. 189.)

The Redevelopment Agency argues the August roll is a temporary roll and thus should not count as the roll actually used in connection with the taxation of that property. The argument is flawed for two related reasons. First, the Redevelopment Agency's reading functionally adds a term to the constitutional and statutory provisions that is not there: to wit, the revenue-sharing formula must be based on the "*final* assessment roll . . . last

equalized prior to the effective date of the ordinance . . . ." Second, if, as the Redevelopment Agency insists, only the final, postadjournment assessment roll, and not the assertedly temporary August roll, qualifies as the "assessment roll used in connection with the taxation of [the redevelopment area] property," then the final 1992-1993 assessment roll should be the applicable roll, and not the temporary August 1993-1994 assessment roll. The 1992-1993 final roll is the only final roll that was in existence prior to the effective date of the redevelopment plan ordinance. The Redevelopment Agency has not, however, ever suggested that the 1992-1993 final assessment roll should be used.

To apply the 1992-1993 final roll would also be contrary to the Attorney General's opinion, which *did* address the question whether the previous year's final roll or the current year's August roll should be used when a redevelopment plan becomes effective after the August roll is transmitted to the auditor, but before any postadjournment changes by the assessment appeals board. The Attorney General reasoned that the current year's August roll fully qualified, by statutory definition, as the applicable roll," and not the previous year's final adjusted roll. (56 Ops.Cal.Atty.Gen., *supra*, at pp. 188-189.) ██ █ The Legislature, presumably aware of this opinion since it was issued in 1973, has not undertaken any steps to alter or challenge the Attorney General's construction.[5]

 Accordingly, we conclude that the one and only "assessment roll . . . last equalized prior to the effective date of the ordinance," was the August roll for 1993-1994. The final adjusted assessment roll for 1993-1994 did not come into existence and succeed the August roll until long after the effective date of the ordinance adopting the redevelopment plan. Had the

---

[5] " '[W]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction.' " (*Harris* v. *Capitol Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].) An analogous principle applies to nonjudicial administrative construction of laws: ". . . a presumption that the Legislature is aware of an administrative construction of a statute should be applied if the agency's interpretation of the statutory provisions is of such longstanding duration that the Legislature may be presumed to know of it. [Citations.]" (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1017-1018 [9 Cal.Rptr.2d 358, 831 P.2d 798].) Article XVI, section 16 of the California Constitution has been amended in other respects in 1988, the Legislature has enacted amendments to Health and Safety Code section 33670 several times since 1973 without materially altering the last equalized roll provisions, and the Legislature has also made amendments to some of the relevant Revenue and Taxation Code sections after 1973. The Legislature presumably was aware of the Attorney General's opinion construing these constitutional and statutory provisions, and presumably also has acquiesced in the Attorney General's interpretation of these materials.

City of Long Beach wished the tax increment allocation to be based upon a final last equalized assessment roll, it could have adopted the redevelopment plan ordinance at such a time as it became effective at least three days after the assessment appeals board adjourned for the year, so as to incorporate the final assessment values for that year into the allocation formula.[6]

The Redevelopment Agency also urges that the reasoning of *Redevelopment Agency* v. *Malaki, supra,* 216 Cal.App.2d 480 and *Redevelopment Agency* v. *County of San Bernardino, supra,* 21 Cal.3d 255, justify the lower court's ruling, ordering the County to use reduced base year assessment values. *Malaki* and *San Bernardino* are inapplicable. Both cases concerned the removal of certain properties in the redevelopment area from the taxable base because they were either purchased by a tax-exempt governmental agency or by the redevelopment agency itself. The public purchase of some of the land that had originally been in the taxable base within the redevelopment area effectively removed such property from the definition of "the total sum of the assessed value of the *taxable property* in the redevelopment area." (Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670.) The redevelopment provisions did not deal explicitly with the question of how to treat property which, although originally part of the taxable base, became wholly nontaxable because it was acquired by a tax-exempt governmental entity.

"A 1960 opinion of California Attorney General Stanley Mosk elucidates the issue. 'To illustrate the problem,' he explains, 'it is helpful to consider a hypothetical situation. Assume there is an area which is to be redeveloped and that there are four parcels of property in this area, A, B, C and D. Each had an assessed value of $100 on the last equalized assessment roll prior to the effective date of the ordinance approving the redevelopment plan (hereinafter referred to as the base roll). After redevelopment parcels A, B and C

---

[6]Our determination that the applicable last equalized roll is dependent upon the date the redevelopment ordinance becomes effective also answers the County's contention that use of the final last equalized roll, in itself, works an injustice on the taxing agency. The County has put forth the argument that reductions in assessed value which result from assessment appeals generally reflect temporary economic conditions, and that it would thus be unfair to allow the Redevelopment Agency to lock in a permanent benefit in future years of the tax increment over the temporarily reduced assessed value. A city adopting a redevelopment project could, however, achieve the same seeming inequity, as we have suggested, by the expedient of delaying the effective date of the ordinance until after the final assessment roll has succeeded the August roll as the latest last equalized roll for the measuring year.

We also take this opportunity to decline the request of amici curiae the County of San Bernardino and the California State Association of Counties to take judicial notice of materials concerning the workloads of county assessors. In view of our ultimate resolution of the case, such materials are of little relevance and have no bearing on the issues of statutory construction with which we are faced.

had an assessed value of $200 each and parcel D had an assessed value of $150. Assume also that the rate of tax is a constant 10%. And assume, finally, that parcel A is later acquired by another public agency.

" 'Prior to redevelopment the total taxes raised in the area are $400 × 10% or $40, and the taxing agencies are entitled to the entire amount. After redevelopment, the total taxes raised are $750 × 10% or $75 and the taxing agencies are entitled to $40 and the redevelopment agency special fund is entitled to $35 . . . .

" 'After the acquisition of parcel A by another public agency, the total taxes drop to $550 × 10% or $55. How is the $55 divided between the taxing agencies and the redevelopment agency special fund? There are three possible results and an argument to support each. The first is the redevelopm[e]nt agency special fund gets $35 and the taxing agencies get $20 on the theory that the redevelopment agency special fund should continue to receive the amount representing the total increase in assessed value which occurred after redevelopment. The second is that the taxing agencies should continue to receive $40 and the redevelopment agency special fund receives only $15 on the theory that the taxing agencies should continue to receive the full amount that they were entitled to receive when redevelopment was first completed. The third possible result is that the taxing agencies get $30 and the redevelopment agency special fund gets $25 on the theory that each ought to share proportionately in the loss of revenue due to the removal from the tax roll of the specific parcel of property.

" 'The result turns on the proper interpretation of the phrase "the total sum of the assessed value of the taxable property in the redevelopment project as shown" on the base roll . . . . Although the first alternative could only be reached by a tortured construction of the above words, the language could support either of the other alternatives. The fact that the "total sum of the assessed value" is referred to might be used to argue that the amount of taxes due to the taxing agencies should never fall below the amount which they would have received if the total assessed value as carried on the base roll were used in computing the tax. The more reasonable conclusion, however, is that the taxing agencies should receive only the amount of taxes which they would have received had there been no redevelopment project and that this amount is to be computed by applying the current rate to the total sum of the assessed value of the remaining taxable property on the base roll. In other words, the "total sum of the assessed value of the taxable property" must be redetermined whenever any parcel of property ceases to be "taxable property." ' (35 Ops.Cal.Atty.Gen. 211, 212-213 (1960).)" (*Redevelopment Agency* v. *County of San Bernardino, supra*, 21 Cal.3d 255, 259-261.)

Both the California Supreme Court in *San Bernardino* and the Court of Appeal in *Malaki* reached the same conclusion. The reduction in the base year roll was justified because certain redevelopment area properties had been completely removed from the classification as taxable property for purposes of calculating the revenue-sharing formula, and because the redevelopment scheme itself had not expressly provided for the contingency that property originally treated as taxable property should cease to be such.

Here, however, there is no reason to resort to *Malaki* or *San Bernardino*. None of the properties which were subject to assessment appeals have ceased to be taxable property.

Under a commonsense reading of the relevant provisions of the Constitution, the redevelopment law, and the Revenue and Taxation Code, the applicable base year roll was the August 1993 assessment roll. Special legislation authorizing the post-riot redevelopment did expressly permit the base year assessed values to be reduced under Revenue and Taxation Code section 170 for loss of value resulting from destruction or damage to the property (see Stats. 1992, ch. 1253, § 1(c), p. 5987), but otherwise, a fair reading of the applicable provisions does not permit the "assessment roll . . . last equalized *prior to*" adopting the redevelopment ordinance to encompass an assessment roll last equalized only *after* that time.

## DISPOSITION

For the reasons stated, we conclude upon our independent analysis of the law that the lower court erred in granting the Redevelopment Agency's writ petition, and should not have ordered the base roll reduced by later-resolved assessment appeals. Accordingly, we reverse the judgment of the trial court granting a writ of mandate, and direct it to enter a new judgment denying the writ of mandate. (*Harris* v. *City of Costa Mesa* (1994) 25 Cal.App.4th 963, 972-976 [31 Cal.Rptr.2d 1].) Defendants shall recover costs on appeal.

Hollenhorst, Acting P. J., and Gaut, J., concurred.

A petition for a rehearing was denied October 15, 1999, and respondent's petition for review by the Supreme Court was denied January 19, 2000. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.