[No. B136115. Second Dist., Div. Two. May 31, 2001.]

COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

James K. Hahn, City Attorney, Dov Lesel, Assistant City Attorney, Ronald Low, Deputy City Attorney; Goldfarb & Lipman, Lee C. Rosenthal and David M. Robinson for Plaintiff and Appellant.

Lloyd W. Pellman, County Counsel, and Thomas M. Tyrrell, Principal Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**BOREN, P. J.—**

### INTRODUCTION

Community Redevelopment Agency of the City of Los Angeles (CRA) and the County of Los Angeles (County) dispute the manner in which

property tax revenue is shared. The dispute centers on County's interpretation of Revenue and Taxation Code section 95.3 (section 95.3), which reduces the amount of revenue that CRA receives. We uphold County's interpretation and affirm.

## BACKGROUND

California law authorizes the creation of community redevelopment agencies to rehabilitate blighted areas. These agencies adopt plans for specific blighted areas, and pursuant to these plans the agencies become entitled to the increase in tax revenues attributable to the redevelopment area covered by the agencies' plans. Generally, as property values in a redevelopment area increase, tax revenues also increase. These incremental increases are referred to as "tax revenue increments" or simply "tax increments." Community redevelopment agencies typically use bonds to fund redevelopment projects and then use allocations of the tax increments to repay the bonds.

The Legislature, in accordance with the California Constitution (art. XVI, § 16), has provided that local taxing agencies remain entitled to the tax revenues they would have received had development not been undertaken. By the same token, redevelopment agencies are entitled as a general principle to the increase in tax revenue generated by a redevelopment project. (Health & Saf. Code, §§ 33670, 33671; *Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255, 258, 266 [145 Cal.Rptr. 886, 578 P.2d 133].)

Nonetheless, the Legislature has previously required that redevelopment plans contain limitations on the total amount of tax increment that a plan can receive. Plans promulgated with such tax increment limitations thus cap the total amount of tax increment a plan will receive.

The present appeal concerns interpretation of section 95.3 and its application with respect to tax increment limitations. Section 95.3 allows a county's auditor to attribute administrative and overhead costs to various jurisdictions and agencies—including community redevelopment agencies—for which a county collects and to which a county pays tax revenues. CRA is one of the agencies for which County collects tax revenue. County, in calculating its payment of tax revenues to CRA, deducts or withholds the section 95.3 administrative costs attributable to each redevelopment plan from the tax increment allocated to each plan.

With respect to three redevelopment plans, CRA disputes County's interpretation and application of section 95.3. CRA does not assert that County

improperly calculates the amount of the deduction. Rather, CRA asserts that County's procedure of offsetting or withholding the administrative costs from the revenue it allocates and pays to CRA is not authorized by section 95.3. County responds that if the administrative costs are not deducted from the allocation, redevelopment agencies would, in the final analysis, avoid payment of these costs, shift the burden to other jurisdictions and special districts, and make illusory the assessment of the administrative fee.

CRA filed a complaint contending that County's methodology is improper and results in underpayment of revenue to CRA. The trial court did not agree with CRA, denied CRA's petition for writ of mandate, and dismissed the complaint for declaratory relief, injunctive relief and damages.

### Factual and Procedural History

The Community Redevelopment Law (CRL) and other statutes authorize the formation of redevelopment agencies such as CRA and empower them to adopt redevelopment plans. (Health & Saf. Code, § 33000 et seq.) CRA has adopted three plans denominated respectively the Pico Union #2 Plan (Pico Union Plan), the Crenshaw Plan, and the Central Business District Plan (CBD Plan). CRA adopted the Pico Union Plan on November 24, 1976, the Crenshaw Plan on May 9, 1984, and the CBD Plan on July 18, 1975.

The CRL and portions of the Revenue and Taxation Code provide that a redevelopment plan receives property tax revenue generated by the increases in property values attributable to the area governed by the plans and also by tax rate increases. A county's auditor then calculates and pays a redevelopment agency in accordance with certain formulas proportionally related to the increase in tax revenues.

The CRL limits the duration of redevelopment plans and requires certain plans to limit the tax dollars they may receive pursuant to the plans. (Health & Saf. Code, §§ 33333.2, 33333.4.) Section 33333.2 requires that redevelopment plans have time limitations. Section 33333.4 pertains to plans adopted before October 1, 1976, without these time limitations and, in subdivision (a)(1), requires that such a redevelopment plan be subject to: "A limitation on the number of dollars of taxes which may be divided and allocated to the redevelopment agency pursuant to the plan, including any amendments to the plan. Taxes shall not be divided and shall not be allocated to the redevelopment agency beyond that limitation." Subdivision (g) of section 33333.4 pertains to redevelopment plans adopted after October 1, 1976, and prior to January 1, 1994, and in subdivision (g)(1) contains the exact requirement presented in subdivision (a)(1). Thus, all three redevelopment plans at issue herein are subject to the allocation limitation provisions of section 33333.4.

In the early 1990's, at a time when public funds were in crisis, the Legislature enacted several provisions to foster the economic viability of county governments. The Legislature enabled counties to recoup the administrative and overhead costs of collecting and apportioning tax revenues. (See Sen. Bill No. 2557 (1989-1990 Reg. Sess.), enacted as Stats. 1990, ch. 466, § 4, pp. 2043-2045.) Several adjustments were made concerning the special revenue and tax problems of school districts. In 1994, the Legislature enacted section 95.3 (Assem. Bill No. 3347 (1993-1994 Reg. Sess.), enacted as Stats. 1994, ch. 1167, § 3, p. 6906), which was later amended.

Presently, subdivisions (a) and (b) of section 95.3 provide in pertinent part as follows:

"(a) Notwithstanding any other provision of law, for the 1990-91 fiscal year and each fiscal year thereafter, the auditor shall divide the sum of the amounts calculated with respect to each jurisdiction, Educational Revenue Augmentation Fund (ERAF), or community redevelopment agency pursuant to Sections 96.1 and 100, or their predecessor sections, and Section 33670 of the Health and Safety Code, by the countywide total of those calculated amounts. The resulting ratio shall be known as the 'administrative cost apportionment factor' and shall be multiplied by the sum of the property tax administrative costs incurred in the immediately preceding fiscal year by the assessor, tax collector, county board of equalization and assessment appeals boards, and auditor to determine the fiscal year property tax administrative costs proportionately attributable to each jurisdiction, ERAF, or community redevelopment agency. . . .

"(b)(1) Each proportionate share of property tax administrative costs determined pursuant to subdivision (a), except for those proportionate shares determined with respect to a school entity or ERAF, shall be deducted from the property tax revenue allocation of the relevant jurisdiction or community redevelopment agency, and shall be added to the property tax revenue allocation of the county. . . ."

In sum, section 95.3 authorizes a county to apportion to itself from tax revenues what the parties variously call a "Property Tax Administrative Funding," or a "Property Tax Administrative Fee," or simply a "PTAF." Using a formula based on a ratio, which the statute calls the "administrative cost apportionment factor," (§ 95.3, subd. (a)) a county's auditor determines the total cost of administering the collection of property taxes and then calculates the share of those costs attributable to each jurisdiction, including community redevelopment agencies. Under subdivision (b)(1), the county deducts this "proportionate share . . . from the property tax revenue

allocation of the . . . community redevelopment agency." The county then adds the deducted amounts "to the property tax revenue allocation of the county." (*Ibid.*) County's deduction of PTAF reduces CRA's net allocation.

Subdivision (e) of section 95.3 states: "(e) It is the intent of the Legislature in enacting this section to recognize that since the adoption of Article XIII A of the California Constitution by the voters, county governments have borne an unfair and disproportionate part of the financial burden of assessing, collecting, and allocating property tax revenues for other jurisdictions and for redevelopment agencies. The Legislature finds and declares that this section is intended to fairly apportion the burden of collecting property tax revenues and is not a reallocation of property tax revenue shares or a transfer of any financial or program responsibility."

The Pico Union Plan contains a $14 million tax increment limitation divided and allocated over the life of the plan. The tax revenue increment paid to that plan reached the $14 million limitation amount on or about July 20, 1994. CRA thereafter repaid to County an amount above the limitation that had been paid to it by County. As to this plan, CRA receives no further tax increment. But on March 1, 1996, County determined that it was owed an additional $107,113.63—the amount of PTAF owing. County deducted that amount from subsequent allocations to the CRA.

The Crenshaw Plan limits allocation of tax increments to $500,000 per year. In each fiscal year from 1993-1994 through 1997-1998 (except for 1995-1996), the Crenshaw Plan had a tax increment of $500,000. For each of those years, County deducted the PTAF from the tax increment allocation. The total PTAF deducted for this period is $67,261.55.[1]

Initially, the CBD Plan had a $7.1 billion limitation for the life of the plan. In a lawsuit, *Bernardi v. City of Los Angeles* (Super. Ct. L.A. County, 1977, No. C133468), the parties stipulated to a judgment that reduced the limitation to $750 million. That tax increment limitation will be reached in either 2003 or 2004. Upon reaching the limitation, County, using its present methodology, will have, in CRA's view, underpaid CRA approximately $5 million.

Alleging the foregoing amounts are underpayments of, or improper offsets against, its allocation of tax revenue increments, CRA filed a complaint for

---

[1]The parties agree that the PTAF's for the Crenshaw Plan were as follows: $20,289.26 for 1993-1994; $16,159.91 for 1994-1995; $14,942.76 for 1996-1997; and $15,669.62 for 1997-1998. The sum of these amounts is $67,061.55. (Because of the agreement of the parties, we do not concern ourselves with an apparent $200 discrepancy.)

declaratory relief, writ of mandate, injunction and damages. The complaint alleges that CRA and County dispute the manner in which County is required to apply section 95.3. CRA contends that "the funds allocated and paid to the County pursuant to . . . Section 95.3 should not be included as Tax Increment received by [CRA] for purposes of the Tax Increment limitations in" CRA's three plans named above.

The parties stipulated to the operable facts, to the admission of documentary evidence, and to the trial court's use of Legislative Intent Service materials provided to the court. The parties agreed that the matter was entirely one of law.

After the receipt of trial briefs, further declarations and argument, the trial court denied the petition for writ of mandate (the second cause of action) and invited further briefing on whether the court's ruling subsumed the remaining causes of action. Subsequently, the trial court entered a judgment in favor of County, denying all causes of action and dismissing the complaint. The court also filed a written statement of decision.

On appeal, CRA contends that the trial court's interpretation of section 95.3 is erroneous and not consistent with the legislative history or rules of statutory construction. CRA also maintains that under CRA's interpretation of section 95.3, County will be fully compensated for its administrative costs.

## DISCUSSION

The only issue for this court to decide is the application of section 95.3 to County's procedure of deducting the PTAF from CRA's gross allocation of tax increments. County's methodology is, on its face, rational. It also seems to accord with the legislative determination that the county auditor should deduct "[e]ach proportionate share of property tax administrative costs determined pursuant to subdivision (a) . . . from the property tax revenue allocation of the . . . community redevelopment agency, and . . . add[] [it] to the property tax revenue allocation of the county." (§ 95.3, subd. (b)(1).)

As we discern the substance of CRA's proposed interpretation of section 95.3, CRA contends that the section 95.3 funds "are allocated and paid to the County and not to the Agency." CRA in essence claims that County's procedure works an impermissible reallocation of tax revenues. CRA reasons that the section 95.3 "revenues allocated to the County cannot also be allocated to the Agency." Added to this argument is the statement that "The

Applicable Statutory Provisions Are Clear." CRA argues then that the deductions should not reduce the total amount of tax revenue increment that the allocation limitations allow and that is actually paid to CRA.

The problem with this argument is that subdivision (b)(1) of section 95.3 expressly states: "Each proportionate share of property tax administrative costs determined pursuant to subdivision (a) . . . *shall be deducted* from the property *tax revenue allocation of the . . . community redevelopment agency*, and shall be added to the property tax revenue allocation of the county. . . ." (Bold italics added.) On its face, County's procedure is exactly that prescribed in subdivision (b)(1). It is CRA's revenue allocation that is diminished, not County's. This conclusion is bolstered by the legislative intent language in subdivision (e) of section 95.3 that "this section is intended to fairly apportion the burden of collecting property tax revenues." Any other interpretation of section 95.3 would allow a redevelopment agency, especially where allocation limitations are in effect, to avoid or shift the burden to other agencies or to County.

CRA seeks support for its argument by relying on the Legislature's statement in subdivision (e) of section 95.3 that the section "is not a reallocation of property tax revenue shares . . . ." We agree with County that such ambiguity as may seem to exist in section 95.3 is reconciled by the Legislature's repeated reference to the PTAF as a "charge" rather than as a tax revenue allocation. For example, in subdivision (d) of section 95.3, the statute specifies that PTAF "shall constitute charges for those services" of "assessing, equalizing, and collecting property taxes" on behalf of the other taxing agencies. Moreover, if the PTAF were merely an allocation of tax revenue to County, rather than to the taxing agencies, no purpose would be served by subdivision (d)'s limitation that this revenue "shall be used only to fund costs incurred by the county in assessing, equalizing, and collecting property taxes, and in allocating property tax revenues . . . ."

The PTAF was initially promulgated in 1990 as part of Senate Bill No. 2557 (1989-1990 Reg. Sess.) (Stats. 1990, ch. 466, § 4, pp. 2043-2045). Both sides and the trial court have referred to Senator Kenneth L. Maddy's letter dated August 31, 1990, respecting the purposes of the bill. With reference to the PTAF, Senator Maddy, as author of the bill and as the state Senate's Republican floor leader, wrote: "Section 4 of the bill authorizes counties to charge a fee to other local jurisdictions for the actual costs of administration of the property tax system . . . . [¶] It also was the intent that the fees for cities, redevelopment agencies, and special districts be withheld from the respective shares of the property tax of each of these entities." With

this pronouncement in mind, the only reasonable interpretation of section 95.3 is that the PTAF is a charge against revenue allocations and was intended to reduce the shares of tax revenue allocated to the local entities.

For its contention that the PTAF deduction should not diminish its revenue allocation (and thus cause the allocation limitations to bar payment of additional increment sooner), CRA relies upon an opinion of the California Attorney General, 76 Ops.Cal.Atty.Gen. 137 (1993). CRA's reliance is misplaced. ■ An opinion of the Attorney General "is not a mere 'advisory' opinion, but a statement which, although not binding on the judiciary, must be 'regarded as having a quasi judicial character and [is] entitled to great respect,' and given great weight by the courts. (*People* v. *Shearer* (1866) 30 Cal. 645, 652; *Montessori Schoolhouse of Orange County, Inc.* v. *Department of Social Services* (1981) 120 Cal.App.3d 248, 259 [175 Cal.Rptr. 14].)" (*Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245, 263 [226 Cal.Rptr. 361].) Whether or not binding on this Court, the opinion cited by CRA does not interpret section 95.3 but rather deals with payments the redevelopment agency may be obligated to make to other governmental entities. Moreover, a careful scrutiny of the opinion reveals that it tends to support the statutory interpretation that the trial court made.

For example, the opinion examines the legislative requirement of a "20 percent set-aside" for low- and moderate-income housing. (See Health & Saf. Code, § 33334.2.) The opinion concludes that a redevelopment agency must calculate this 20 percent set-aside "based upon the total tax increment revenues allocated to the agency—irrespective of any subsequent transfers made by the agency to other public entities." (76·Ops.Cal.Atty.Gen., *supra*, at p. 144.) The opinion is based on the plain meaning of the statutes involved in concert with the stated legislative intent. The trial court's—and our—interpretation is likewise based on the plain meaning of section 95.3, supported by evident legislative intent.

CRA's slant on the Attorney General's opinion is not supportive of CRA's position in other respects. The opinion holds that the applicable statutes require that " 'all' taxes allocated to a redevelopment agency . . . are to serve as the amount upon which the 20 percent set-aside is calculated. . . . The statute [i.e., Health and Safety Code section 33334.2] contains no explicit or implicit exception for funds transferred by a redevelopment agency to other public entities." (76 Ops.Cal.Atty.Gen., *supra*, at p. 140.) The opinion holds that the 20 percent set-aside must be applied to the entire allocation even though the allocated revenues are also subject to " 'pass-through agreements' " and other obligations. (*Id.* at p. 138.) Thus, the

set-aside amounts must be derived from the gross tax revenue allocated to the agency.

In reaching its ultimate conclusion, the opinion necessarily deals with four other related Health and Safety Code provisions. Concerning section 33401, the opinion holds that it "does not alter the amount of tax increment funds to be allocated to a redevelopment agency" because the statute does not "allow[] tax increment revenues to bypass a redevelopment agency." (76 Ops.Cal.Atty.Gen., *supra*, at p. 141.) The statute authorizes a redevelopment agency to "pay directly" to "school districts" and other public corporations or governmental districts an amount of money equivalent to the tax revenue the agency would have received on tax exempt property owned by the agency in the project area had that property been taxed. The payments are "passed-through" directly from the tax revenue funds the agency receives as its tax revenue allocation. As with the low-income housing set-aside, this "pass-through" money is deducted from the total amount of tax revenue the agency receives.

Health and Safety Code section 33446 has a purpose similar to that of section 33401 in that it benefits school districts. Section 33446 allows the redevelopment agency to construct buildings for use by a school district with title eventually vesting in the district. But instead of tax revenue funds "passing-through" to the school district, the agency directly expends its redevelopment funds for construction. The Attorney General's opinion observes: "Unquestionably the revenues involved in the expenditure have already been allocated to the redevelopment agency under the terms of section 33670 and are therefore subject to the 20 percent set-aside provision of section 33334.2." (76 Ops.Cal.Atty.Gen., *supra*, at p. 142.)[2]

The Attorney General's opinion lastly analyzes Health and Safety Code section 33676. But the opinion concludes that this provision differs from the other four. The opinion states that section 33676 "has the effect of directly allocating to other public entities certain portions of the tax revenues that would ordinarily be allocated to a redevelopment agency" and these revenue funds, "unlike those subject to pass-through agreements, do in fact bypass the redevelopment agency through the allocation procedure." (76 Ops.Cal.Atty.Gen., *supra*, at p. 143.)

In summary, the Attorney General's opinion shows that the Legislature in plain language requires that set-aside and pass-through funding that

---

[2]In passing, we note that a redevelopment agency's school construction expenditures may in fact be paid from its financing (e.g., government guaranteed bonds), rather than from its tax revenue allocations. Nonetheless, in paying off the bonds with its tax increment, the agency ultimately pays for the school construction from its allocations.

a redevelopment agency provides to benefit school districts and other public entities to offset some of the consequences of redevelopment are drawn from the tax revenue allocated to the agency. We see no significance in the fact that the redevelopment agency, rather than the taxing agency, actually deducts the funds from the allocation. The result is the same in either case: a diminution of the amount of funds the redevelopment agency has to apply to the project's other financial obligations.

The plain language of the statute here permits County to deduct the PTAF from CRA's tax increment allocation and is in harmony with the legislative intent to allow counties to cover their administrative costs. To follow CRA's interpretation of section 95.3 would allow redevelopment agencies with capped plans to avoid those costs. If the deduction did not reduce the capped allocation, CRA would in essence, under the circumstances pertinent here, recover its PTAF payments in the year it reached the cap limit. Moreover, this recovery would be at the expense of other local entities.

CRA also attempts to bolster its contention that section 95.3 is a reallocation, as opposed to the collection of the PTAF as a charge, by reference to the language of the California Constitution. Section 16, subdivision (b), of article XVI, to which CRA refers, does provide that the tax revenue increment from a redevelopment plan area "shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency . . . ." CRA grasps this provision to contend at least implicitly that any interpretation of section 95.3 that permits the PTAF to be deducted from CRA's revenue allocation violates the constitution. This contention is without merit and attempts to resurrect a claim previously rejected by another division of this Court.

In *Arcadia Redevelopment Agency v. Ikemoto* (1993) 16 Cal.App.4th 444 [20 Cal.Rptr.2d 112], a redevelopment agency challenged the imposition of the PTAF as to redevelopment agencies as presented by chapter 466 of Statutes 1990. The agency claimed that it was impermissible to reduce the agency's tax revenue receipts because the California Constitution—specifically article XVI, section 16—protected this funding, rendering it mandatory. (*Arcadia Redevelopment Agency v. Ikemoto, supra,* 16 Cal.App.4th at pp. 448-451.) Division Three of this district of the Court of Appeal rejected the contention and found that section 16 of article XVI "does not prevent the Legislature from altering the levying and collection of taxation on redevelopment project property in a manner consistent with which it alters the levying and collection of taxation on other property." (16 Cal.App.4th at p. 452.) Whether a redevelopment agency's tax revenues are reduced by a

proper alteration of the levy and collection of taxes or by a charge for administrative costs, the principle is the same. The Legislature is so empowered as long as it acts with an even hand. Thus, Division Three upheld the statute against the constitutional challenge. (*Id.* at p. 446.) We explicitly approve and adopt the rationale of the *Arcadia* opinion.

In addition, we observe that the language in section 16 of article XVI of the California Constitution that the tax revenue "shall be allocated to and when collected shall be paid" to the redevelopment agency is not inconsistent with section 95.3. A redevelopment agency ultimately pays all of its financial obligations from its tax revenue allocations. The PTAF is a proper obligation and payable to the county administering and collecting the taxes. Whether deducted up front or paid upon presentment of an invoice, the effect should be the same: the agency's tax revenue income is reduced by the deduction or payment.

The remainder of CRA's arguments focus on the purposes and intentions of the Legislature. In the main, these arguments stress the lack of legislative intent evidence respecting other statutes related to tax revenue allocation for redevelopment plans. Reduced to its essentials, CRA argues that there was no legislative intent that the PTAF should reduce the allocations of capped plans. Resort to the absence of legislative intent material is not helpful and does not demonstrate the proposition CRA urges. Here, section 95.3 proclaims that the PTAF is to "be deducted from the property tax revenue allocation of the . . . community redevelopment agency." (Subd. (b)(1).) The statute further states that the PTAF "shall constitute charges for those services" (subd. (d)) and that it "is intended to fairly apportion the burden of collecting property tax revenues." (Subd. (e).) In this complex area of property tax and redevelopment finance, clearer statements of procedure and purpose would be difficult to achieve. Because the statute is sufficiently clear in method and intent and because County's implementation does not conflict with the process and procedure set forth in section 95.3, we uphold the trial court's determination.

## DISPOSITION

The judgment is affirmed.

Cooper, J., and Doi Todd, J., concurred.