[No. F050180. Fifth Dist. July 5, 2007.]

COMMUNITY DEVELOPMENT COMMISSION OF THE CITY OF
OXNARD, Plaintiff and Appellant, v.
COUNTY OF VENTURA et al., Defendants and Respondents.

1472

**COUNSEL**

Kane, Ballmer & Berkman, Murray O. Kane, Stephanie R. Scher, Donald P. Johnson; and Gary L. Gillig for Plaintiff and Appellant.

Nordman Cormany Hair & Compton and Meghan B. Clark for California State University Channel Islands Site Authority as Amicus Curiae on behalf of Plaintiff and Appellant.

Noel A. Klebaum, County Counsel, and Lori A. Nemiroff, Assistant County Counsel, for Defendants and Respondents.

**OPINION**

**CORNELL, J.**—We must decide whether escape assessments, an assessment that is made because the property in question was not assessed during the initial assessment period, should be included in computing the tax increment used to determine the funding for redevelopment agencies. This is an issue of first impression.

The Community Redevelopment Law (CRL) (Health & Saf. Code, § 33000 et seq.) provides for the formation of redevelopment agencies to help

eradicate blight. Typically, a redevelopment agency prepares a redevelopment plan and then borrows money to complete the plan. A redevelopment agency repays its debt using tax increment. Tax increment is based on the theory that property values will increase as a redevelopment occurs. The increase in property values will cause an increase in tax revenue. The tax increment is the tax revenue attributable to the increased property values.

Defendants County of Ventura and Christine L. Cohen (collectively, the County) argue that escape assessments should not be included in computing the tax increment. Plaintiff Community Development Commission of the City of Oxnard (CDC) and amicus curiae California State University Channel Islands Site Authority disagree. We conclude the controlling statutes require inclusion of all tax revenue, including escape assessments, in computing the tax increment.

## THE FUNDING PROCESS

We begin with a review of the role of redevelopment agencies in California and their funding. We do so to give meaning to the factual basis of the dispute.

### Property Taxation

█ "All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation under" the Revenue and Taxation Code. (Rev. & Tax. Code, § 201.) The county assessor must assess all property subject to general property taxation at its full value on January 1 of each year. (*Id.*, §§ 117, 128, 401, 401.3, 2192.) The county assessor assesses all real property within the county, while the initial valuation of business personal property is made from a business property statement prepared by the taxpayer. (Cal. Const., art. XIII, § 2; Rev. & Tax. Code, §§ 110, 110.1, 441; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1328 [101 Cal.Rptr.2d 591].)

A lien for the yearly assessment attaches to the property "annually as of 12:01 a.m. on the first day of January preceding the fiscal year for which the taxes are levied." (Rev. & Tax. Code, § 2192.) "The subsequent assessment and levy are necessary in order to fix the amount of the tax but they do not result in the creation of a new obligation; they are simply administrative steps necessary to the enforcement of the right which accrued on the lien date. [Citations.] When the amount is ascertained, it relates back to the time the lien became fixed." (*California Computer Products, Inc. v. County of Orange* (1980) 107 Cal.App.3d 731, 736–737 [166 Cal.Rptr. 68] (*California Computer Products*).)

Once property is assessed, it is listed on the assessment roll, which must be made available for inspection by the public. (Rev. & Tax. Code, §§ 601, 1602.) A property owner may dispute the assessment of his or her property by appealing to the county board of equalization.[1] (Cal. Const., art. XIII, § 16; Rev. & Tax. Code, §§ 1601, 1603.) An application for equalization (reduction) of an assessment must be filed before September 15.[2] (Rev. & Tax. Code, § 1603, subd. (b)(1).)

■ The county board of equalization meets to decide the issues raised in the various equalization applications (Rev. & Tax. Code, § 1604, subds. (a), (b)) and has the authority to "equalize the values of all property on the local assessment roll by adjusting individual assessments." (Cal. Const., art. XIII, § 16.) "Equalization" has been defined as "adjusting the value of property assessed to conform to its real value." (*County of Sacramento v. Assessment Appeals Bd. No. 2* (1973) 32 Cal.App.3d 654, 663 [108 Cal.Rptr. 434].) After the completion of the equalization hearing process, required changes are made to the assessment roll, which becomes the equalized assessment roll. (Rev. & Tax. Code, §§ 1614, 1646.1.)

Reference is made in various statutes to the phrase "last equalized assessment roll." This phrase, or similar words, "means the entire assessment roll" on August 20, which shall include "any changes made by the county board during the month of July, together with" changes made pursuant to Revenue and Taxation Code sections 755 and 756. (*Id.*, §§ 2051, 2052.) The above provisions, including the right to file an application for equalization of an assessment up to September 14, establish that the last equalized assessment roll may not reflect all changes to initial assessments during any tax year.

*Escape Assessments*

■ Another type of assessment that probably will not be reflected in the equalized assessment roll is an escape assessment. If property has been either underassessed or unassessed, "the assessor shall assess the property . . . at its value on the lien date for the year for which it escaped assessment. It shall be subject to the tax rate in effect in the year of its escape." (Rev. & Tax. Code, § 531; see also *American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1127 [51 Cal.Rptr.2d 251, 912 P.2d 1198].) Section 531 of the Revenue and Taxation Code "simply extends the power and duty of the assessor, enabling and requiring him . . . to list and assess property which he had failed to assess, notwithstanding the time for assessments had passed . . . .

---

[1] The "county board" of equalization is defined as a county board of supervisors meeting as a county board of equalization. (Rev. & Tax. Code, § 1601, subd. (a).)

[2] In theory, a property owner may file an application for equalization to increase the assessment of his or her property, but this seems to be a rare occurrence.

And the exercise of this power is directly in accord with the policy and express provisions of the constitution, which requires all property not exempt from taxation to be taxed." (*Farmers' etc. Bank v. Board* (1893) 97 Cal. 318, 323–324 [32 P. 312] [discussing former Pol. Code, § 3681].)

Escape assessments are to be treated the same as "property regularly assessed on the roll on which it is entered." (Rev. & Tax. Code, § 534, subd. (a).) "The statutory scheme for escaped assessments thus embodies the principle that the right to the taxes on escaped property accrues on the lien date, not on the date of entry on the tax roll." (*California Computer Products, supra*, 107 Cal.App.3d at p. 737.)

### The CRL

■ The CRL authorizes the formation of redevelopment agencies and empowers them to adopt redevelopment plans. (Health & Saf. Code, § 33000 et seq.; *Community Redevelopment Agency v. County of Los Angeles* (2001) 89 Cal.App.4th 719, 722 [107 Cal.Rptr.2d 693].) The purpose of the CRL is to "promote the sound development and redevelopment of blighted areas and the general welfare of the inhabitants of the communities in which they exist by remedying such injurious conditions." (Health & Saf. Code, § 33037, subd. (a); see also *Community Redevelopment Agency v. Bloodgood* (1986) 182 Cal.App.3d 342, 344 [226 Cal.Rptr. 924].)

The redevelopment agency is "primarily responsible for implementing the Community Redevelopment Law and . . . is empowered to prepare and effectuate a redevelopment plan for the elimination of blighted areas in the community. [Citations.]" (*Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082 [251 Cal.Rptr. 778, 761 P.2d 701].) To accomplish this goal, "[r]edevelopment agencies are endowed with broad powers to acquire property through purchase and condemnations ([Health & Saf. Code,] § 33391) and to '[m]ake and execute contracts and other instruments necessary' to complete redevelopment projects ([Health & Saf. Code,] § 33125, subd. (c))." (*Ibid.*)

Redevelopment agencies, however, do not have the power to assess taxes. (*Community Redevelopment Agency v. Bloodgood, supra*, 182 Cal.App.3d at p. 344.) Redevelopment agencies have the authority to acquire debt by either borrowing money through loans or the sale of bonds to finance its projects. (Health & Saf. Code, § 33601.) "The agency's major source of funds to repay its debts is its share of property taxes levied by other government agencies on property within a redevelopment project area." (*Community Redevelopment Agency*, at p. 344; see also Health & Saf. Code, § 33670.)

■ The system devised to divide the tax revenue between the redevelopment agency and other government entities that otherwise would receive the

funds is known as tax increment. Tax increment is based on the theory that the assessed value of the property in the redevelopment district will increase as a result of the redevelopment projects. This increase in assessed value will lead to an increase in tax revenue. The increase in tax revenue is known as the tax increment and is used to pay for the cost of redevelopment. (Rev. & Tax. Code, § 96.1, subd. (a)(2).)

This division of tax revenue is described in *Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133]: "[I]f, after a redevelopment project has been approved, the *assessed valuation of taxable property* in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project." (See also Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670.)

The first step in determining the tax increment is to establish a base year assessed value of all of the taxable property within the redevelopment project area. Health and Safety Code section 33670, subdivision (a) defines the base year as "the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of that property by the taxing agency, last equalized prior to the effective date of the ordinance" that approved the redevelopment plan.[3] (See also Cal. Const., art. XVI, § 16.) All taxes attributable to the base year assessed value of the property are distributed as they would have been had a redevelopment plan not been adopted. (Health & Saf. Code, § 33670, subd. (a).)

The tax revenue from the increase in the value of the property above the base year assessed value (the tax increment), if any, "shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay" for the indebtedness incurred in financing the redevelopment project. (Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670, subd. (b).)

## FACTUAL SUMMARY

The dispute in this case arises from a mistake made by the Ventura County Assessor's Office (assessor's office). The parties stipulated to all relevant facts.

---

[3] In other words, the equalized assessment roll as it existed on the August 20 that preceded the ordinance.

CDC is the governing body for the Oxnard Redevelopment Agency, which is duly organized pursuant to the CRL. All of the redevelopment areas under CDC's control are within the County of Ventura. Christine L. Cohen was the auditor-controller for the County of Ventura at all relevant times.

The City of Oxnard adopted several redevelopment plans pursuant to the applicable provisions of the CRL, including the historic enhancement and revitalization of Oxnard redevelopment plan (HERO Plan). An electrical cogeneration power plant (power plant) was located within the area subject to the HERO Plan for several years before the fiscal year beginning July 1, 2000, and ending June 30, 2001.

The assessor's office was responsible for assessing the value of the real property, improvements, and fixtures at the power plant. The assessor's office failed to assign any value to the fixtures located at the power plant by July 1, 2000, despite having done so in previous years. The parties agree the omission was inadvertent. The certified assessor's roll sent to the county auditor, therefore, included assessments only for the land and improvements. The total assessment included in the certified assessor's roll for the power plant was $704,128 and the total tax was computed to be $9,203.10. Various adjustments were made to the certified assessor's roll after it was submitted to the county auditor, and on August 20, 2000, it became the equalized assessment roll.

It appears the failure to assess the value of the fixtures at the power plant was discovered sometime after the assessment roll was equalized on August 20, 2000. On February 14, 2001, the assessor's office transmitted an assessment roll change to correct the omission. This escape assessment placed the value of the fixtures for the power plant at $43,074,200, causing a tax increase of $509,763.27.[4]

When the error was discovered, CDC requested the county auditor to adjust CDC's tax increment to include the missing assessment. The auditor refused, citing a long-standing practice to base tax increments on the equalized assessment roll without adjustments for changes to the assessment roll that would affect the tax increment either positively or negatively.

## PROCEDURAL SUMMARY

CDC combined a petition for writ of mandate, complaint for damages, and a request for declaratory relief in a single document filed in Ventura County

---

[4] The property owner disputed the assessment on the fixtures and it was reduced by stipulation to $42,501,500, a change that is insignificant to the issues before us.

Superior Court (the complaint). The complaint sought (1) a writ of mandate directing the County to distribute all tax increment pursuant to the provisions of Health and Safety Code section 33670; (2) damages according to proof; and (3) a declaration that the computation of the tax increment must include escape assessments. The County filed an answer denying all the allegations of the complaint and asserting various affirmative defenses.

CDC's motion for change of venue was granted, and the matter was transferred to Kern County Superior Court. (Code Civ. Proc., § 394, subd. (a).) Four witnesses testified at the trial. The two primary witnesses were David Schey and Christine L. Cohen.

Schey testified as both a percipient witness and an expert witness for CDC. Schey is a fiscal consultant who works for various cities and redevelopment agencies throughout California. He discussed the escape assessment and the evolution of the current dispute. He also determined that CDC would have been entitled to an additional $1,121,825.74 for fiscal years 2000–2001 through 2004–2005 if all changes not reflected in the equalized assessment roll had been included in the tax increment calculation.[5] From his experience, Schey knew other counties also base the tax increment calculation on the equalized assessment roll, but many also make periodic corrections to the computation.[6] In his experience, some counties base the tax increment on actual taxes collected.

Cohen, the auditor-controller for Ventura County, testified that she declined to include the escape assessment in the tax increment calculation because CDC was unable to provide an interpretation of the code that would convince her that the County's approach was incorrect. She was not aware of any resolutions adopted by the Ventura County Board of Supervisors relating to the calculation of tax increment. If the tax increment were calculated on the actual tax receipts, it *could* be onerous for her office because it is easier to compute the tax increment on the equalized roll. No one in her office examined the data to determine the net effect on the tax increment as a result of all the changes to the equalized roll. The tax revenue generated from the power plant escape assessment was distributed to those entities that would otherwise receive tax proceeds if there were no redevelopment occurring. She did not know how many roll corrections occur in redevelopment areas, although the total roll corrections for the entire county for one year was approximately 10,000.

---

[5] This figure is for all of CDC's redevelopment projects, not just the HERO Plan.

[6] Another witness, Roxanne Koutzoukis, testified that the majority of counties calculate tax increment based on the equalized roll. She also testified that the Ventura County auditor has calculated the tax increment in this manner for approximately 40 years.

The trial court entered judgment in favor of the County, concluding the term "levied taxes" in Health and Safety Code section 33670, subdivision (b) referred to taxes generated from the equalized assessment roll.

## ANALYSIS

Resolution of this dispute requires us to apply Health and Safety Code section 33670 (hereafter section 33670) to the undisputed facts in this case. Since we are interpreting statutory and constitutional provisions, we review the matter de novo. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

■ Our interpretation of section 33670 is guided by well-established principles. First, we look to the plain meaning of the words of the statute to ascertain the intent of the lawmakers so that the purpose of the statute may be fulfilled. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 273 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) We may not look to extrinsic sources if the statute is clear and unambiguous on its face. (*People v. Otto* (1992) 2 Cal.4th 1088, 1100 [9 Cal.Rptr.2d 596, 831 P.2d 1178].) Nor may we add to or alter the words of a statute to accomplish a purpose that does not appear on the face of the statute. (*DaFonte*, at p. 601.)

The parties agree that the base year assessment required by section 33670, subdivision (a) is the assessment as reflected on the last equalized assessment roll before the effective date of the ordinance establishing the redevelopment district. The parties also agree that any escape assessments that occurred after the assessment roll was equalized, but before the effective date of the ordinance, are not part of the base year assessment calculations. (*Redevelopment Agency v. County of Los Angeles, supra*, 75 Cal.App.4th at pp. 78–79.)

The relevant portion of section 33670, subdivision (b) provides that the "portion of the levied taxes each year in excess of [the taxes levied on the base year assessment] shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans." CDC argues section 33670, subdivision (b) requires the tax increment be based on the taxes assessed *and collected* for the property within the redevelopment district, including any escape assessments or other changes to the equalized assessment roll. The County, on the other hand, argues that subdivision (b) requires the tax increment be calculated on the equalized assessment roll without adjustment for any changes, either positive or negative, that may occur after August 20 (the date on which the assessor's roll is equalized).

We disagree with the approach of the County.

Unlike section 33670, subdivision (a), subdivision (b) of this section does not refer to the equalized assessment roll. Instead, subdivision (b) states the redevelopment agency is to receive the benefit of "that portion of the levied taxes" in excess of the taxes attributable to the base year assessments. It is apparent from the plain meaning of these words that the Legislature intended to include in the tax increment calculation all tax revenue generated from the property in the redevelopment area. The lack of any words to limit the application of the phrase "levied taxes" in subdivision (b) precludes any other conclusion.

The County's approach would require us to modify section 33670, subdivision (b) by replacing the phrase "levied taxes" with the phrase "taxes levied on the equalized assessment roll." We reject this request for three reasons. First, we are not permitted to add words to a statute to accomplish a purpose that is not apparent from the face of the statute. (*DaFonte v. Up-Right, Inc., supra*, 2 Cal.4th at p. 601.)

Second, the Legislature clearly knew how to refer to the last equalized assessment roll when it wanted to do so. (See, e.g., § 33670, subd. (a).) Indeed, the Legislature provided a comprehensive definition of the term in Revenue and Taxation Code section 2050 et seq. Since section 33670, subdivision (a) refers to the equalized assessment roll in the calculation for base year assessments, it is clear the Legislature would have inserted language to limit the revenue calculation in subdivision (b) of section 33670 to revenue generated from the equalized assessment roll *if that were its intention*. The failure to mention the equalized roll in subdivision (b) is compelling evidence that the tax revenue to which the redevelopment agency is entitled is not restricted to the revenue based on the equalized assessment roll.

Third, our resolution minimizes the possibility of mischief. There can be hostility between counties and redevelopment agencies over revenue. While the parties agree the mistake in this case was innocent, one easily can imagine a situation where an auditor's mistake is not so perceived by an agency or the public. This is especially so when a mistake would minimize the tax revenue due to the redevelopment agency and increase the revenue to be paid to other jurisdictions.

Another factor compels our conclusion that such mistakes, no matter how innocent, should not accrue to the detriment of the redevelopment agency. Redevelopment agencies frequently issue bonds to pay for the cost of redevelopment. (*Bell Community Redevelopment Agency v. Woosley* (1985)

169 Cal.App.3d 24, 28 [214 Cal.Rptr. 788].) The marketability of those bonds is based in part on the redevelopment agency's ability to pay the principal and interest due on the bonds. (See generally *In re Nathan's Estate* (9th Cir. 1948) 166 F.2d 422, 424–425, fn. 1; *Davis v. United States* (C.D.Cal. 1969) 306 F.Supp. 949, 954.) An investor must be able to estimate the tax revenue that the redevelopment agency will receive. It would be difficult for investors to evaluate the bond issue if the redevelopment agency's revenue were dependent upon the efficiency of the assessor's office. The Legislature could not have intended such instability.

■ Each of these reasons leads us to reject the County's position and conclude that escape assessments must be included in the tax increment calculation.[7]

*The County's Contentions*

The County offers numerous arguments why its approach is correct. We will discuss the main points.

*Revenue and Taxation Code section 96.6*

The County contends that Revenue and Taxation Code section 96.6, subdivision (a) requires the tax increment to be calculated on the equalized roll. This section explains how redevelopment tax increment is to be allocated to the taxing jurisdictions when the area included in the redevelopment plan involves more than one taxing jurisdiction.

■ The county auditor first is instructed to withdraw the revenue determined to be due to the redevelopment agency "pursuant to Section 33670 of the Health and Safety Code." (Rev. & Tax. Code, § 96.6, subd. (a).) Next, the auditor is to refer to the tax rates set pursuant to Revenue and Taxation Code section 96.5 to determine how much of that revenue should be charged to each taxing agency within the area included in the redevelopment plan. Finally, the statute states, "In order to determine each jurisdiction's share of that redevelopment increment, the factors or rates for all tax rate areas that are part of a redevelopment project shall be applied to the *current assessed value of the taxable property* within the redevelopment project area, less the assessed valuation on the" base year assessment. (*Id.,* § 96.6, subd. (a), italics

---

[7] The County requests us to take judicial notice of the staff analysis of Senate Bill No. 1877 (2003–2004 Reg. Sess.), which never was enacted. Senate Bill No. 1880, passed in 2004, deleted the requirement found in Revenue and Taxation Code section 533 that escape assessments must be written onto the equalized assessment roll and permitted the information to be maintained in an electronic database. (Sen. Bill No. 1880 (2003–2004 Reg. Sess.) § 6.) We deny the request for judicial notice because Senate Bill No. 1877 was not enacted.

added.) Citing Revenue and Taxation Code section 2050, the County asserts that the reference to "current assessed value of the taxable property" refers to the assessments on the last equalized roll.

Revenue and Taxation Code section 2050 provides no authority for this argument. That statute provides that the phrase " 'last equalized county assessment roll,' in those words or in similar words, or in any words intended to refer to the latest or current assessment roll of the county," is defined pursuant to the rules provided in that chapter. (*Ibid.*) The phrase is defined in the subsequent statutes to include the entire assessment roll (*id.*, § 2051) as amended by the county board of equalization as it exists on August 20 (*id.*, § 2052).

The County's error is that the phrase "current assessed value of the taxable property," as used in Revenue and Taxation Code section 96.6, subdivision (a), is not the equivalent of the phrase "last equalized county assessment roll." Instead, current assessed value of the taxable property, like section 33670, subdivision (b)'s requirement that *all levied taxes* are to be included in the tax increment, reflects the intent to include all property at its current assessed value. This phrase is inconsistent with the County's argument that errors in the equalized assessment roll may not be corrected.

### Unnecessary to refer to the last equalized roll

We also reject the suggestion that the Legislature concluded it was unnecessary to refer to the last equalized assessment roll in section 33670, subdivision (b). The County makes various arguments to support this contention. First, it claims the Legislature reached this conclusion because each year the levied taxes are based on the equalized roll. The facts in this case prove this assertion wrong. The levied taxes in the 2000–2001 fiscal year included over $500,000 in taxes that were based on an assessment that was not included in the equalized assessment roll.[8]

Second, the County argues the reference to the last equalized assessment roll in section 33670, subdivision (a) necessarily included the phrase in subdivision (b) of that section. We think the opposite is true. As explained above, the reference to the last equalized assessment roll in subdivision (a) establishes that the Legislature knew how to refer to that document when it intended to do so. The decision to refer to all levied taxes, instead of the taxes levied on the equalized assessment roll, demonstrates that the legislative intent was to ensure that the redevelopment agencies received all incremental tax revenue, not just that revenue generated from the equalized assessment roll.

---

[8] We also reject the argument that only the taxes calculated using the equalized roll are "levied." There is no authority for this assertion.

Nor does the Legislature's use of the word "levied" in both subdivisions (a) and (b) of section 33670 support the County's position. Subdivision (a) refers to "the rate upon which the tax is levied each year." Subdivision (b) refers to the "portion of the levied taxes each year." This portion of each subdivision refers to the taxes levied, or imposed, in a specific year using the current assessment and the current tax rate. The Legislature's choice of these words does not provide any support for the County's position that the phrase "that portion of the levied taxes each year" is restricted to those taxes imposed on the equalized assessment roll.

### *Escape assessments are not levied*

The County takes its argument one step further, suggesting that the tax imposed as a result of an escape assessment is not "levied" as that term is used in section 33670, subdivision (b). Thus, according to the County, the taxes resulting from an escape assessment are not to be included in calculating the tax increment. The basis for this argument, it appears to us, is the assertion that because Revenue and Taxation Code section 531, which authorizes imposition of escape assessments (and other changes to assessments on the equalized roll), does not state that the resulting tax is levied, then the resulting tax falls outside the scope of section 33670.

The relevant portion of Revenue and Taxation Code section 531 states, "If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment. It shall be subject to the tax rate in effect in the year of its escape except as provided in Section 2905 of this code." In other words, tax is imposed as if the assessment were performed timely and accurately. (See also *California Computer Products, supra*, 107 Cal.App.3d at pp. 737–738.)

We fail to see any significance in the Legislature's choice of words. The County is attempting to create ambiguity where none exists by citing numerous cases that discuss the different meanings of the word "levy" as the context changes. (See, e.g., *Hayne v. San Francisco* (1917) 174 Cal. 185, 195–196 [162 P. 625]; *Alpha Beta Acme Markets, Inc. v. City of Whittier* (1968) 262 Cal.App.2d 16, 21–22 [68 Cal.Rptr. 327]; *Crow v. Board of Supervisors* (1933) 135 Cal.App. 451, 459 [27 P.2d 655].) In the statutes pertinent to this issue, it is clear to us the Legislature has used the word "levy" in the sense of imposing a tax after the value of the property and the tax rate have been determined. This same procedure is undertaken regardless of whether the property is timely and accurately assessed or is subject to tax after an escape assessment.

■ The County attempts to distinguish the two situations (tax based on the equalized assessment roll and tax based on an escape assessment) by arguing the statute authorizing an escape assessment authorizes only "ministerial administrative procedures to process additional charges or refunds resulting from changes in assessed value after the roll is equalized." This, of course, is not a distinction at all. Once the tax rate is determined by the governing body, the determination of the taxes to be imposed (levied) is nothing more than a "ministerial administrative procedure" performed by multiplying the tax rate by the assessed value of the property. (See *California Computer Products, supra,* 107 Cal.App.3d at pp. 736–737; *City of Long Beach v. Aistrup* (1958) 164 Cal.App.2d 41, 51–52 [330 P.2d 282].) *This is the same calculation made after an escape assessment.* The change in value of the property is multiplied by the tax rate to determine the amount of refund to be paid to the taxpayer, or the amount of additional taxes due from the taxpayer.

This is the same calculation made when the tax increment is determined. The full assessed value of the property and the base year assessed value of the property are both multiplied by the tax rate. The tax collected pursuant to the base year assessment is forwarded to the taxing agency, and the difference (tax on current assessed value minus tax on base year assessed value) is the tax increment to be held for the redevelopment agency. There is no difference in the calculations. This argument by the County is not persuasive.

*Escape assessments are distributed differently*

The County also contends that the tax revenue from the escape assessment is somehow distributed differently than other assessments. It may be true, as the County asserts, that property tax revenue is allocated to local agencies and schools "using complex formulas and methods defined in the Revenue and Taxation Code." All tax revenue, however, is distributed according to the complex formulas and methods found in the Revenue and Taxation Code.

■ Moreover, the authority cited by the County, Revenue and Taxation Code section 95 et seq., refutes the County's contention. Revenue and Taxation Code section 96.1, subdivision (a) provides that property tax revenues must be apportioned to each jurisdiction pursuant to the provisions in that section and in Revenue and Taxation Code section 96.2, *"subject to allocation and payment of funds as provided for in subdivision (b) of Section 33670 of the Health and Safety Code."* (*Id.,* § 96.1, subd. (a), italics added.) Since the complex formulas and methods cited by the County require the tax increment to be paid to the redevelopment agencies, it is clear that the taxes generated as a result of escape assessments are not treated differently than other tax revenue.

*The de minimis effect of escape assessments*

The County next argues that it should not be required to comply with the law because the net effect of escape assessments is minimal. The County begins by pointing out that while escape assessments may increase tax revenue, they also can decrease tax revenue if an assessment is decreased. The County asserts that it does not decrease a redevelopment agency's tax increment if an escape assessment lowers tax revenue within the redevelopment area. Over time, the County claims, the net effect of increases and decreases in assessments will offset each other. This net effect excuses compliance with the law.

First, there was no substantial evidence supporting these factual assertions.

Next, the simple answer to this contention is that the County may not choose to ignore a law simply because it decides that over time there will not be any injury.

We also reject the County's related argument that it should not be required to comply with section 33670, subdivision (b) because it will be too burdensome. If that is the case, and there was no substantial evidence to support this assertion, the County should seek a modification of the statute through the Legislature. We have no authority to excuse compliance with the statute. There was testimony, however, that some of the state's largest counties interpret the statute as we do, and they do not claim the task is too onerous.

*The "Teeter Plan"*

The County refers to the Teeter Plan (Rev. & Tax. Code, § 4701 et seq.), which provides an alternative method for distribution of certain tax revenues. The parties agree, however, that the prerequisites for adoption of a Teeter Plan were not met here. Teeter Plans, therefore, are irrelevant to our analysis.

*The accounting standards and procedures manual*

The County also relies on the California State Controller's Office manual, which provides uniform accounting procedures for counties. (Gov. Code, § 30200.) This manual, entitled "Accounting Standards and Procedures for Counties," addresses accounting for redevelopment agencies in chapter 18, section 18.07. This section does not address the issue of escape assessments within a redevelopment area.

The County argues, however, that the following sentence from this section supports its position: "The method by which the annual tax increment due [a

redevelopment agency] is computed is governed by Health and Safety Code section 33670 et seq. and specific resolutions or policies adopted by the county (if any)." (State Controller's Off., State of California Accounting Standards and Procedures for Counties (May 2003) ch. 18, § 18.07, p. 18.27.) The County claims that its "longstanding and consistent interpretation" of section 33670 to preclude consideration of escape assessments in computing the tax increment is a policy of the County's.

We reject this argument for two reasons. First, there is no evidence of a specific resolution or policy adopted by the County. The evidence clearly indicates that the County's "policy" was merely a way of doing things for many years. Second, even if the County adopted such a policy, it would not be enforceable if it violated section 33670.

Nor does the remainder of chapter 18, section 18.07 of the Accounting Standards and Procedures for Counties manual assist the County. An example of how a tax increment should be calculated is included in the manual. The demonstrated procedure appears to be consistent with section 33670. This example, however, does not address escape assessments. We will not find authority in a manual that does not address the issue we are considering. Accordingly, the Accounting Standards and Procedures for Counties manual is irrelevant, as are the cases cited by the County that suggest courts should give deference to an administrative agency's interpretations of statutes within its area of "expertise." (See, e.g., *Chevron U. S. A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 842–845 [81 L.Ed.2d 694, 104 S.Ct. 2778]; *Marek v. Napa Community Redevelopment Agency, supra,* 46 Cal.3d at pp. 1085–1086.)

*Acceptable state audits*

Similarly, we are not persuaded by audits conducted by the State Controller's Office. These audits have not found any deficiency in the method used by the County to compute the tax increment due redevelopment agencies. But the County has not cited any portion of the audits that suggest the issue of escape assessments was considered. Nor was there any testimony by the preparer of these audits to establish this topic was considered by the auditors. Simply stated, the audits are good as far as they go, but they do not go far enough to assist the County. Again, we will not find authority in a document that does not address the issue we are considering.

## CONCLUSION

The trial court erred in interpreting section 33670. We will remand the matter to the trial court to enter a new judgment and consider other unresolved issues raised by the pleadings.

## DISPOSITION

The judgment is reversed and remanded to the trial court, which is instructed to enter a new and different judgment requiring the County to include escape assessments in its calculation of the tax increment due to redevelopment agencies. Community Development Commission of the City of Oxnard is awarded its costs on appeal.

Wiseman, Acting P. J., and Dawson, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 10, 2007, S155386.