[No. B212718. Second Dist., Div. Five. May 25, 2010.]

GLENDALE REDEVELOPMENT AGENCY, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

[No. B213410. Second Dist., Div. Five. May 25, 2010.]

REDEVELOPMENT AGENCY OF THE CITY OF COMPTON, Plaintiff
and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Luce, Forward, Hamilton & Scripps, Douglas J. Evertz; and Gillian van Muyden, General Counsel, for Plaintiff and Appellant Glendale Redevelopment Agency.

Goldfarb & Lipman, John T. Nagle and Juliet E. Cox for Plaintiff and Appellant Redevelopment Agency of the City of Compton.

McDonough Holland & Allen and T. Brent Hawkins for The California Redevelopment Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Elizabeth M. Cortez, Assistant County Counsel, and Thomas M. Tyrrell, Principal Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**ARMSTRONG, J.**—Appellants are community redevelopment agencies "empowered to prepare and effectuate a redevelopment plan for the elimination of blighted areas in the community." (*Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082 [251 Cal.Rptr. 778, 761 P.2d 701] (*Marek*).) Under the Community Redevelopment Law (Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33000 et seq.[1]), they are able to fund this activity because they are entitled to a certain portion of the property tax attributable to the redevelopment project. The amount is calculated through a statement of indebtedness (SOI) prepared by the redevelopment agency and submitted to the taxing authority by the agency "[n]ot later than October 1 of each year." (§ 33675, subd. (b).)

Appellants submitted SOI's to the County of Los Angeles (County), and some time later, after realizing that the SOI's were erroneous, submitted revised SOI's which showed that they were entitled to additional funds. The County refused to accept the revised SOI's or to remit additional funds, writing that under section 33675 it had no discretion to accept an amended SOI. The two agencies filed a petition for writ of mandate, seeking an order that the County accept their revised SOI's and pay the additional sums for the year in question. The trial court denied the petition. We reverse.

### The Statutory Scheme

The Community Redevelopment Law (CRL) "provides for the formation of redevelopment agencies to help eradicate blight." (*Community Development Com. v. County of Ventura* (2007) 152 Cal.App.4th 1470, 1475 [62 Cal.Rptr.3d 383].) The law was adopted in 1951, and after voter approval was made a part of the California Constitution (now in art. XVI, § 16) in 1952.[2] (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866, fn. 7 [62 Cal.Rptr.3d 614, 161 P.3d 1168].)

---

[1] All further statutory references are to this code.

[2] In pertinent part, California Constitution, article XVI, section 16, provides that "All property in a redevelopment project established under the Community Redevelopment Law . . . shall be taxed in proportion to its value as provided in Section 1 of this article, and those taxes . . . shall be levied and collected as other taxes are levied and collected by the respective taxing agencies. The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied upon the taxable property in a redevelopment project each year . . . after the effective date of the ordinance approving the redevelopment plan, shall be divided as follows: [¶] . . . [¶] (b) Except as provided in subdivision (c), that portion of the levied taxes each year in excess of that amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project. Unless and until the total assessed valuation of the taxable property in a

■ Under the CRL, redevelopment is financed through tax increment financing. In essence, a redevelopment agency, which is not empowered to tax, but which is empowered to acquire debt through loans or the sale of bonds (§ 33601), finances a redevelopment project through borrowing. When the redevelopment results in increased property values in the redevelopment area, the tax attributable to the increase in value—the tax increment—is distributed by the taxing authority to a special fund of the redevelopment agency, to pay the principal of and interest on its debt. (§ 33670, subd. (b).) " 'This way, the redevelopment project in effect pays for itself.' [Citations.]" (*City of Dinuba v. County of Tulare, supra*, 41 Cal.4th at pp. 865–866; see *Community Development Com. v. County of Ventura, supra*, 152 Cal.App.4th at pp. 1475–1476.)

Taxes which are not attributable to the increase in property values, but which are instead attributable to a pre-redevelopment "base year value," are distributed as they would have been had a redevelopment plan not been adopted. (*Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133]; § 33670, subd. (a).)

Importantly, an agency is entitled to the increment only in the amount of its indebtedness, less available revenue. (§ 33675, subd. (g).) Any tax increment in excess of that amount is distributed as base year taxes are distributed. (§ 33670, subd. (b).)

■ The amount of tax increment to which an agency is entitled each year is calculated through an annual SOI. Under section 33675 "(b) Not later than October 1 of each year, for each redevelopment project for which the redevelopment plan provides for the division of taxes pursuant to Section 33670, the agency shall file, with the county auditor or officer described in subdivision (a), a statement of indebtedness and a reconciliation statement certified by the chief financial officer of the agency." The statute specifies the information about debt and revenue which must be included in the SOI.

---

redevelopment project exceeds the total assessed value of the taxable property in the project as shown by the last equalized assessment roll referred to in subdivision (a), all of the taxes levied and collected upon the taxable property in the redevelopment project shall be paid into the funds of the respective taxing agencies. When the loans, advances, and indebtedness, if any, and interest thereon, have been paid, then all moneys thereafter received from taxes upon the taxable property in the redevelopment project shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid."

Facts[3]

In September 2006, appellant Glendale Redevelopment Agency (the Glendale Agency) submitted a fiscal year 2006–2007 SOI for its San Fernando Road Corridor Redevelopment Project Area. This SOI showed $11,645,880 of indebtedness and $7,069,024 in available revenue. The County distributes property taxes over 10 months, beginning in November, and based on the SOI, it distributed $4,576,856 to the Glendale agency. This was $2.2 million less than the total tax increment created by the redevelopment project. That tax increment was distributed to other agencies, including the County's general fund.

However, in May 2007, the Glendale Agency realized that its SOI had omitted debt associated with a 2000 owner participation and development agreement (OPA) between the Agency and the Walt Disney Company. The CRL provides that a redevelopment agency may pledge its tax increment to fund expenses related to a certain project and that such a pledge "shall have priority over any other claim to those taxes not secured by a prior express pledge of those taxes." (§ 33671.5.) Pursuant to this statute, the Glendale Agency had pledged 75 percent of the tax increment attributable to the OPA. The County knew of this indebtedness and the pledge, having entered into an agreement with the Glendale Agency and the City of Glendale, under which the County agreed to pass back to the Glendale Agency a portion of the County's share of tax increment. On May 24, 2007, the Glendale Agency submitted a revised 2006–2007 SOI to the County, reflecting the Disney OPA.

The revised SOI for appellant Redevelopment Agency of the City of Compton (the Compton Agency) concerns fiscal year 2005–2006. The Compton Agency's SOI for that year both overstated revenue and understated debt. Pursuant to this SOI, Compton was allocated $13,351,015 in tax increment payments, leaving $4.3 million in tax increment. That sum was distributed to other entities. The Compton Agency submitted its revised 2005–2006 SOI on January 16, 2007, showing that it was entitled to the entire tax increment for 2005–2006.

---

[3] The County's request that we take judicial notice of the reporter's transcript of oral argument in the trial court and the trial court's tentative decisions in this case is granted. The request by the Glendale Redevelopment Agency that we take judicial notice of the decision of a different trial court, in a different matter (*California Redevelopment Assn. v. Genest*) is denied. We grant that agency's request that we take judicial notice of evidence of the County's 2009 adjustment to the agency's 2008–2009 tax increment distribution.

In each instance, the County refused to accept the revised SOI, writing that the County "has no discretion to accept an amended Statement of Indebtedness (SOI) after the statutory deadline, much less to reallocate property tax revenues on that basis."

With their petitions, appellants produced evidence that it was not unusual for the County to make adjustments to correct accounting discrepancies or to correct miscodings. For example, in 2004, the County acknowledged that over a period of three years, the County had paid approximately $293,000 of the Azusa Redevelopment Agency's tax increment to the Los Angeles County Fire Protection District, and agreed to reallocate funds so that the agency received all the increment which was due to it.

Discussion

The parties agree, correctly, that the issue is statutory interpretation and our review is de novo. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

Appellants contend that section 33675 is silent on the question of revised SOI's, and is ambiguous. They ask us to construe the statute in light of the CRL as a whole, and argue that the statute does not prohibit the County from accepting, and acting on, a revised SOI, and that the County has a duty to distribute the additional tax increment. They cite the statutory and constitutional requirement that tax increment which reflects revenues and debt "shall" be distributed to the redevelopment agency (Cal. Const., art. XVI, § 16; §§ 33670, subd. (b), 33675, subd. (a)) and point out that under the County's reading of the statute, that revenue is instead given to entities which have no statutory or constitutional entitlement to it. They also point out that the entire statutory and constitutional scheme for community redevelopment depends on a market for redevelopment agencies' debt, and argue that if an error in a SOI cannot be corrected, and tax increment may be distributed to other agencies, the stability of that market is threatened.

The County sees no ambiguity, and argues that with section 33675, the Legislature limited the time within which an agency can claim a given year's tax increment. The County further argues that the Legislature was empowered to enact such a limit, citing California Constitution, article XVI, section 16, which provides, inter alia, that "[t]he Legislature may provide that any redevelopment plan may contain a provision" for the tax increment financing and that "[t]he Legislature shall enact those laws as may be necessary to enforce the provisions of this section." (Cal. Const., art. XVI, § 16.) The County sees appellants' argument as a facial challenge to section 33675's

constitutionality and argues that "restrictions on the authority of the Legislature are to be strictly construed . . . ." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1217 [70 Cal.Rptr.2d 745].)

We agree with appellants. Section 33675 is ambiguous. The statute does, as the County argues, provide that an agency "shall" file an SOI no later than October 1, but we cannot see that with that language, it also provided that an agency can never amend an SOI if an error is discovered. Nor do we agree with the County that anything else in section 33675 so provides.

■ The County's first argument on this point concerns section 33675, subdivision (h), which provides that the SOI "constitutes prima facie evidence of the loans, advances, or indebtedness of the agency," but that a county auditor may dispute that amount through a procedure and within the time limits set out in the statute. The County argues that the time limits require prompt review, and that the subdivision means that the October 1 SOI must be the final one, so that the challenge, if any, can commence. We see something different in subdivision (h). It does not provide that an SOI may never be revised, but instead indicates that the October SOI is not necessarily the end of the process. If an agency's SOI may be challenged, it may also be corrected.

Section 33675, subdivision (c)(2) leads us to the same conclusion. It provides that "[t]he agency may estimate the amount of principal or interest, the interest rate, or term of any loan, advance, or indebtedness if the nature of the loan, advance, or indebtedness is such that the amount of principal or interest, the interest rate or term cannot be precisely determined." A statute which allows estimates when precise data is not available clearly contemplates that an estimate may be corrected when the data is available.

Nor are we persuaded by the County's reference to section 33675, subdivision (g), which provides that the County must pay the tax increment "at the same time or times as the payment of taxes into the funds of the respective taxing entities." We see nothing in this direction to counties which places a limit on a redevelopment agency's ability to correct an error in an SOI. This is especially true because the County makes its payments over time.

■ Thus, the question before us is not whether the Legislature could constitutionally limit redevelopment agencies to the tax increment justified by a single annual SOI, with no possible revision, but whether the Legislature has done so. In answering that question, we turn to the well-established rules of statutory construction. "Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105

Cal.Rptr.2d 457, 19 P.3d 1196].) However, "The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) "[E]ach sentence must be read not in isolation but in the light of the statutory scheme [citation] . . . ." (*Ibid.*) "These rules apply as well to the interpretation of constitutional provisions." (*Ibid.*)

■ Our review of the statutory and constitutional scheme and the cases which have interpreted that law leads us to conclude that appellants are correct. Section 33675 does not prohibit the County from accepting a revised SOI. To the contrary, on receipt of a revised SOI, it is required to pay redevelopment agencies all the tax increment to which they are entitled.

■ A county's duty to distribute tax revenue in accord with the provisions of the CRL and the rest of the statutory scheme is mandatory. (*City of Dinuba v. County of Tulare, supra*, 41 Cal.4th at pp. 865–866.) California Constitution, article XVI, section 16 and Health and Safety Code section 33670 identically provide that tax increment "*shall* be allocated to and when collected *shall* be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project." (Cal. Const., art. XVI, § 16, subd. (b), italics added; § 33670, subd. (b), italics added.) Subdivision (a) of section 33675 is very similar: "The portion of taxes required to be allocated pursuant to subdivision (b) of Section 33670 *shall* be allocated and paid to the agency by the county auditor . . . ." (§ 33675, subd. (a), italics added.) It is not until "the loans, advances, and indebtedness . . . have been paid," that "all moneys thereafter received . . . shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid." (Cal. Const., art. XVI, § 16, subd. (b); see § 33670, subd. (b).)

■ In this context, section 33675, subdivision (b) is a procedural provision which sets out the method through which a county is to perform its duty. It is not a limit on the county's duty to distribute all the tax increment to which a redevelopment agency is legally entitled.[4]

■ In interpreting a statute, we must embrace the meaning which best effectuates the legislative purpose. (*Santa Ana Unified School Dist. v. Orange County Development Agency* (2001) 90 Cal.App.4th 404, 410 [108 Cal.Rptr.2d

---

[4] We need not reach the issue of what happens if the original SOI is filed late.

770].) Case law tells us that the legislative purpose behind the CRL and the tax increment financing scheme was to further redevelopment by ensuring that redevelopment agencies may acquire, and repay, debt. (*Marek, supra*, 46 Cal.3d 1070; *Community Development Com. v. County of Ventura, supra*, 152 Cal.App.4th 1470.)

■ The issue in *Marek, supra*, 46 Cal.3d 1070, was the meaning of "indebtedness" in the CRL, and whether, as the agency asserted, the term included executory obligations. The Supreme Court agreed with the agency that it did, finding that the purpose of the CRL and the structures created by it supported the agency's view. The court noted that redevelopment agencies are responsible for implementing the CRL and thus have broad powers to acquire property and make contracts, and that they rely on tax increment funds for the exercise of their powers. The court concluded that "Since redevelopment agencies are statutorily empowered to enter into binding contracts to complete redevelopment projects, the term 'indebtedness' must be interpreted in a way that will enable those agencies to perform their contractual obligations. In this light, we think it clear that 'indebtedness' was meant to include all redevelopment agency obligations, whether pursuant to an executory contract, a performed contract or to repay principal and interest on bonds or loans. To insure its ability to perform its obligations, a redevelopment agency is entitled to all tax increment funds as they become available, until its 'loans, advances and indebtedness, if any, and interest thereon have been paid . . . .' (Art. XVI, § 16; § 33670 . . . .)" (46 Cal.3d at p. 1082.)

■ *Marek, supra*, 46 Cal.3d 1070 also rejected the auditor's theory that the auditor was "a kind of guardian of tax increment revenues to ensure that other local tax entities . . . receive their fair share," finding that "It is the Auditor's function to see that the aggregate amount of tax increment revenues paid to the Agency does not exceed the aggregate of its indebtedness. In other words, it is only when the Agency's total indebtedness has been paid that tax increment revenues are to be paid to the other tax entities. (§ 33670; *Redevelopment Agency v. County of San Bernardino, supra*, 21 Cal.3d 255, 259.) Until that time the county auditor is required to pay all available tax increment funds up to the amount of the agency's indebtedness to the redevelopment agency for deposit into its 'special fund.' . . . [¶] Contrary to the position of the Auditor, it is not the purpose of the statement-of-indebtedness procedure to permit other tax entities to share in tax increment revenues at any time before the agency's total indebtedness has been paid or the amount in its 'special fund' is sufficient to pay its total indebtedness. (Art. XVI, § 16; § 33670 [see fn. 3, *ante*].)" (*Id.* at pp. 1086–1087.)

In *Community Development Com. v. County of Ventura, supra*, 152 Cal.App.4th 1470, the court was called on to construe section 33670, which

concerns the base year determination, and to decide whether escape assessments (assessments made because the property in question was not assessed during the initial assessment period) should be included in the computation. (*Community Development Com.*, at p. 1475.) The court determined that, based on the language of the statute, escape assessment must be included. The court also found that "Another factor compels our conclusion that such mistakes, no matter how innocent, should not accrue to the detriment of the redevelopment agency. Redevelopment agencies frequently issue bonds to pay for the cost of redevelopment. (*Bell Community Redevelopment Agency v. Woosley* (1985) 169 Cal.App.3d 24, 28 [214 Cal.Rptr. 788].) The marketability of those bonds is based in part on the redevelopment agency's ability to pay the principal and interest due on the bonds. (See generally *In re Nathan's Estate* (9th Cir. 1948) 166 F.2d 422, 424–425, fn. 1; *Davis v. United States* (D.C.Cal. 1969) 306 F.Supp. 949, 954.) An investor must be able to estimate the tax revenue that the redevelopment agency will receive. It would be difficult for investors to evaluate the bond issue if the redevelopment agency's revenue were dependent upon the efficiency of the assessor's office. The Legislature could not have intended such instability." (*Id.* at pp. 1483–1484.)

As the County argues, *Marek, supra,* 46 Cal.3d 1070, was decided before the current version of section 33675 was enacted, and that, as we have noted, its holding concerns executory agreements, which is not the question before us here. The County concludes that *Marek* is irrelevant, or nearly so. With this, we cannot agree. *Marek*, like *Community Development Com. v. County of Ventura*, provides guidance on the interpretation of the CRL. Here, as in *Marek*, we must interpret the law in a manner which allows redevelopment agencies "to perform their contractual obligations" and conduct redevelopment activities. The agencies cannot do so unless they can sell bonds and otherwise borrow money, and it is manifest that they will not be able to do so if they cannot pay those debts.

 We thus hold that nothing in section 33675 prohibits a redevelopment agency from correcting errors in an SOI by filing a revised document. Any other reading would mean that, if an agency errs in its SOI, tax increment revenues will be retained by entities which have no statutory entitlement to those revenues, to the detriment of the agency and its lenders and bondholders.

The County makes several arguments to the contrary. First, it argues that tax collection and distribution are "time sensitive," and that a ruling in favor of the redevelopment agencies will create a burden on the County. We are not unsympathetic to the argument. A revised SOI will no doubt place a burden on the County, but "courts, however, cannot refuse to enforce the statutory duty simply because of an alleged hardship it would pose to a county." (*City of*

*Dinuba v. County of Tulare, supra,* 41 Cal.4th at p. 869.) *City of Dinuba* considered a redevelopment agency's claim that for several years, it had not been paid all the increment to which it had been entitled. Instead, the county had erred in the assignment of tax rate codes to parcels within the redevelopment project, and distributed to other entities tax increment payments to which the agency was entitled. The county admitted its coding error but refused to make the corrections retroactive and distribute to the agency previously misallocated tax increment revenue. (*Id.* at p. 863.) The agency sued, but the case was dismissed on procedural grounds. The Supreme Court held, inter alia, that mandamus was available "because Agency is seeking to enforce a mandatory duty imposed by statute." (*Ibid.*) The fact that the money had already been distributed elsewhere did not dispel that duty. Further, the court noted that various provisions of the Revenue and Taxation Code appeared to limit any hardship in reallocation. (*Id.* at p. 869.)

The County also relies on legislative history. It sees a different legislative intent in section 33675, an intent to limit redevelopment agencies' access to tax increment revenue. We cannot see that the legislative history of section 33675 supports the County's theory.

As the County argues, section 33675 was significantly amended as part of a 1993 reform of the CRL, initiated by redevelopment agencies in response to calls for reform of post-Proposition 13 practices.[5] Among other things, the legislation put time limits on redevelopment plans and the debt which

---

[5] An August 18, 1993 Senate Committee analysis reported that "Because of its two extraordinary powers—property tax increment financing and real property management—redevelopment remains a 'hot button' political issue. Besides being controversial, redevelopment is very lucrative for communities that use its powers to attract and retain private investment. Stung by repeated criticisms and trying to stave off more radical changes, some redevelopment officials seek statutory reforms." (Sen. Com., Analysis of Assem. Bill No. 1290 (1993–1994 Reg. Sess.) Aug. 18, 1993, p. 1.) The final Assembly floor analysis stated that "Existing CRL provides for a unique relationship between agencies and affected taxing entities. Ideally, affected taxing entities are supposed to act as 'watch dogs' over the adoption of redevelopment plans and challenge inappropriate plans due to the potential loss of property taxes to redevelopment agencies. [¶] While this once may have been the case, the passage of Proposition 13 has substantially changed that relationship. Because of their ability to issue bonds without an election, redevelopment agencies have become one of the few sources of public infrastructure money available to local governments. [¶] Today, instead of being critical of redevelopment taxing entities, some school districts and counties have become very adept at negotiating mitigation agreements for cash, bond payments, and development agreements. Some counties, particularly the County of Los Angeles, have been able to negotiate mitigation agreements which provide an almost 100% pass-through of the property taxes which would have been received by the county in the absence of the redevelopment agency's allocation. [¶] This bill, as passed by the Assembly, eliminated these negotiated mitigation agreements . . . . [¶] By eliminating negotiated pass-through agreements, the sponsor stated, affected taxing entities would be returned to their position of challenging redevelopment plans. With no ability to 'pay off' affected taxing entities, theoretically redevelopment plans will be smaller in scope

redevelopment agencies could incur. (§§ 33333.2, 33333.6.) However, nothing in the legislative history indicates that section 33675 was also intended to preclude amendments. Concerning the SOI, throughout the bill's movement through the Assembly and Senate, the floor and committee analyses state only that the bill would require agencies to file a more detailed SOI. (See, e.g., Assem. Com. on Housing & Community Dev., Analysis of Assem. Bill No. 1290 (1993–1994 Reg. Sess.) as amended May 19, 1993; Sen. Floor Analysis of Assem. Bill No. 1290 (1993–1994 Reg. Sess.) Sept. 14, 1993, p. 3.) Similarly, relevant to amendments to section 33675, the Legislative Counsel's Digest of the enrolled bill says only that the bill would revise the CRL by requiring "the inclusion of specified information on statements of indebtedness required to be filed by redevelopment agencies." (Cal. Legis. Counsel, Enrolled Bill Analysis of Assem. Bill No. 1290 (1993–1994 Reg. Sess.) Mar. 3, 1993.)

From the fact that the legislation limited redevelopment agencies in some ways, we cannot conclude that the Legislature also intended to create the additional limit the County suggests.

The County also relies on *Community Redevelopment Agency v. County of Los Angeles* (2001) 89 Cal.App.4th 719 [107 Cal.Rptr.2d 693] and *Arcadia Redevelopment Agency v. Ikemoto* (1993) 16 Cal.App.4th 444 [20 Cal.Rptr.2d 112]. Both cases concern Revenue and Taxation Code section 95.3, which allows a county to recoup administrative costs from various jurisdictions and agencies through a property tax administration fee—PTAF.

 As *Community Redevelopment Agency v. County of Los Angeles, supra,* 89 Cal.App.4th 719 wrote, "In *Arcadia Redevelopment Agency v. Ikemoto*[, *supra*,] 16 Cal.App.4th 444 . . . , a redevelopment agency challenged the imposition of the PTAF . . . . The agency claimed that it was impermissible to reduce the agency's tax revenue receipts because the California Constitution—specifically article XVI, section 16—protected this funding, rendering it mandatory. (*Arcadia Redevelopment Agency v. Ikemoto, supra,* 16 Cal.App.4th at pp. 448–451.) Division Three of this district of the Court of Appeal rejected the contention and found that section 16 of article XVI 'does not prevent the Legislature from altering the levying and collection of taxation on redevelopment project property in a manner consistent with which it alters the levying and collection of taxation on other property.' (16 Cal.App.4th at p. 452.) Whether a redevelopment agency's tax revenues are reduced by a proper alteration of the levy and collection of taxes or by a charge for administrative costs, the principle is the same. The Legislature is

and more directly beneficial to low-income blighted areas." (Assem. Com. on Housing & Community Dev., Analysis of Assem. Bill No. 1290 (1993–1994 Reg. Sess.) as amended Sept. 8, 1993, pp. 5–6.)

so empowered as long as it acts with an even hand. Thus, Division Three upheld the statute against the constitutional challenge. (*Id.* at p. 446.)" (*Id.* at p. 729.) *Community Redevelopment Agency v. County of Los Angeles* approved and adopted the rationale of the *Arcadia* opinion. (*Community Redevelopment Agency v. County of Los Angeles, supra,* 89 Cal.App.4th at pp. 729–730.)

These cases hold that the Legislature may, constitutionally, charge costs against the tax increment and thus diminish an agency's receipt of the tax increment. They do not tell us that with section 33675, subdivision (b), the Legislature has placed a different limit on the agency's collection of its share, a "claim it or lose it" type of limit. Indeed, they suggest that the Legislature can enact an explicit limit, leading us to conclude that they have not enacted an implied one.

### Disposition

The judgment is reversed. Appellants to recover costs on appeal.

Turner, P. J., concurred.

**MOSK, J.,** Concurring.—I concur to discuss a few matters.

In this case, Health and Safety Code sections 33675, subdivision (b) and 33671.5 require the County of Los Angeles (County) to pay the redevelopment agencies amounts for the indebtedness of the redevelopment agencies (see also Cal. Const., art. XVI, § 16; Rev. & Tax. Code, § 96.5). Health and Safety Code section 33675 sets forth the procedures for the allocation and payment of taxes to the redevelopment agencies. In order for the redevelopment agencies to receive timely payments to which they are entitled, they are to file the statement of indebtedness by October 1 of each year. But the statute does not say that failure to file a statement by October 1 bars any right of a redevelopment agency to the payment of taxes, nor does the statute preclude amendments to the statements of indebtedness after October 1. Health and Safety Code section 33670, subdivision (b) provides, "*Except as provided in subdivision (e) or in Section 33492.15,* that portion of the levied taxes each year in excess of that amount *shall be allocated to and when collected shall be paid* into a special fund of the redevelopment agency to pay . . . loans [to] . . . or indebtedness [of the agency]." (Italics added.) The exceptions to these mandatory duties do not include the time provisions of Health and Safety Code section 33670.

The Supreme Court has said in an administrative law case, "We have held that, generally, requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary

intent is clearly expressed." (*Edwards v. Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365]; see *Woods v. Department of Motor Vehicles* (1989) 211 Cal.App.3d 1263, 1267 [259 Cal.Rptr. 885].) "It is a well-settled rule of construction, applicable to tax statutes, that only those provisions enacted for the benefit of the taxpayer are mandatory, while provisions enacted to secure the orderly conduct of business are merely directory." (*Ryan v. Byram* (1935) 4 Cal.2d 596, 603 [51 P.2d 872]; see *Skelly Estate Co. v. San Francisco* (1937) 9 Cal.2d 28, 33 [69 P.2d 171].) Here, because Health and Safety Code section 33675 provides no "consequence or penalty for failure to act within the prescribed time," the time limit should be viewed as directory rather than mandatory. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1143 [43 Cal.Rptr.2d 693, 899 P.2d 79].)

Even if the Health and Safety Code section 33675 could be read as a deadline,[1] amendments to timely filed documents are not necessarily deemed untimely, even without any express statutory authorization. (See *Blanchard v. Workers' Comp. Appeals Bd.* (1975) 53 Cal.App.3d 590, 595 [126 Cal.Rptr. 187] ["In civil cases it is the rule that the statute of limitations will not bar an amendment to the complaint so long as the amendment does not introduce a wholly difference cause of action."]; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1188, pp. 619–620; 2 Ehrman & Flavin, Taxing California Property (4th ed. 2008–2009) § 26:10, pp. 26-18 to 26-20 [amendment of application for property tax reduction]; cf. *Helene Curtis, Inc. v. Assessment Appeals Bd.* (1999) 76 Cal.App.4th 124 [90 Cal.Rptr.2d 31] [upholding validity of administrative regulation providing that application may not be amended after filing deadline if the amendment contains a request for relief additional to or different in nature from the originally requested].)

The County argues that it already distributed the redevelopment agencies' tax increment amounts to other taxing authorities and that it would be impractical to recover those amounts in order to make additional payments to the redevelopment agencies after they submit their amendments. These taxing authorities presumably have received monies to which they are not entitled. There are means to correct for errors in the distribution of tax revenues. As the court in *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 869–870 [62 Cal.Rptr.3d 614, 161 P.3d 1168] said, "We also note plaintiffs added as named defendants the taxing entities that received misallocated revenue and which continue to be parties in this action. Should plaintiffs succeed, County's obligation may be offset by voluntary repayment by the

---

[1] The trial court suggested the possibility that a late statement of indebtedness could be deemed substantial compliance with the time deadline. Here, the statements of indebtedness were filed months after October 1, and therefore the trial court did not find substantial compliance.

taxing entities or by direct recourse against them by plaintiffs or by County itself. Alternatively, as suggested during oral argument, County may correct the tax rolls that resulted in overpayments to the entities and explore offsetting future payments to recover any amounts now owed to plaintiffs. [Citations.] Whatever County does, it is clear that what it may not do is refuse to comply with its statutory duty to correctly allocate and distribute revenue owed to plaintiffs." (Fn. omitted.)

The County and the trial court reasonably observed that assessments, tax receipts, and allocations are annual and time-sensitive processes that are reflected in Health and Safety Code section 33675. I note that the redevelopment agencies have an incentive to file all the information on time to avoid delays and costs in recovering the funds owed to them, which funds they in turn must pay to their creditors. I am sympathetic to the County's position that if that provision is too elastic, the mechanism could become unwieldy. That is a matter for future resolution. I agree that in this case, the amendments do not violate Health and Safety Code section 33675.